[Civ. No. 53294. Second Dist., Div. Five. Jan. 26, 1979.]

In re the Marriage of PATRICIA M. and ANDREW J. JOHNSON.
PATRICIA M. JOHNSON, Appellant, v.
ANDREW J. JOHNSON, Respondent.

COUNSEL

Robert W. Homan for Appellant.

Charles Glass, Jr., for Respondent.

OPINION

**STEPHENS, Acting P. J.**—Patricia M. Johnson (Patricia) appeals from that part of the judgment of dissolution of marriage to Andrew J. Johnson (Andrew) that denied her request for child support for the minor child James Joseph Johnson (Jimmy) based upon the court's finding that Andrew was not the putative father of the child.

As Justice Tobriner (then an appellate court justice in the First District) so aptly opened the case of *Clevenger* v. *Clevenger*, "[w]e face here the difficult and unique problem of defining the duty of support which a husband owes to his wife's illegitimate child when the husband, from the date of the birth of the child, accepts the child into his family, publicly acknowledges the child as his own and treats the child as if he

were legitimate." (*Clevenger* v. *Clevenger* (1961) 189 Cal.App.2d 658, 662 [11 Cal.Rptr. 707, 90 A.L.R.2d 569].) Justice Tobriner then went on to point out that "under some circumstances the husband would be estopped to assert the illegitimacy of the child and thereby avoid liability for its support . . . ." (189 Cal.App.2d at p. 662.) Although the facts before that court were found to be insufficient as a basis for such an estoppel and the case was remanded for a determination of the issue, we find here that there are sufficient facts for imposition of liability based upon estoppel. ■ Therefore, we hold that the elements formulated in *Clevenger* are present in this case and that Andrew is estopped to deny that he is the putative father of Jimmy.

Patricia and Andrew were married September 9, 1970, in Long Beach, California. Jimmy was born 10 days prior to the wedding, on August 27, 1970; the parties have stipulated that he is not the natural child of Andrew. However, despite this fact, Andrew visited Patricia in the hospital, was allowed to hold the child (a privilege reserved for the parents themselves), and participated in selecting a name for Jimmy. Shortly after his birth, Jimmy was baptized and Andrew stood up with him, and told the priest that he was the child's father; the baptismal record reflects this representation. Further, when Jimmy entered school, Andrew admitted he may have signed some papers as Jimmy's father and that he did in fact attend parent-teacher conferences, identifying himself as Jimmy's father.

Contrary to the above, Andrew claims that he never actually told anyone other than the priest that he was Jimmy's father, although he admitted that his conduct was such that people "assumed" that he was Jimmy's father. He never told Jimmy that he was *not* his father and Jimmy calls Andrew "Daddy." However, Andrew claims that he discussed with Patricia his intention to tell Jimmy the truth, i.e., that he was not his real father, when Jimmy was old enough to understand. Patricia confirmed that this was Andrew's expressed intention, although she felt that he should not so inform the child. Andrew testified that he loves Jimmy, has expressed feelings of affection toward him and has received expressions of love and affection in return from the child. He continued to see Jimmy after he and Patricia were separated and discontinued such visitations only when he felt that it hurt him in trying to fight the award of child support.

In defining the elements necessary for a husband to be estopped from asserting the illegitimacy of his wife's child in order to avoid its support, the court in *Clevenger* said if the facts should show that "the husband

represented to the boy that he was his father, that the husband intended that his representation be accepted and acted upon by the child, that the child relied upon the representation and treated the husband as his father and gave his love and affection to him, that the child was ignorant of the true facts, we would have the foundation of the elements of estoppel. [Citations omitted.]" (189 Cal.App.2d at p. 671.)

Further, in *In re Marriage of Valle* (1975) 53 Cal.App.3d 837 [126 Cal.Rptr. 38], the court applied the foregoing to a situation where the husband and wife had brought the husband's brother's children from Mexico on forged birth certificates listing the husband and wife as the children's parents and reared them as their own. However, when the parties sought to dissolve their marriage, the husband appealed the award of child support on the basis that he was not the children's father. The trial court's finding that he was estopped from denying paternity of the children was upheld on appeal, the court relying on *Clevenger* as "governing authority." (53 Cal.App.3d at p. 841.)

After citing the elements that *Clevenger* held were necessary for estoppel, the court in *Valle* summarized the record and found that it "abundantly sustains all the elements of estoppel." (53 Cal.App.3d at p. 841.) The husband and wife had represented to United States authorities that the children were their natural offspring, such representation continuing for the six years that the couple remained married following bringing the children to the United States. Both parties conceded at trial that they regarded and treated the children as their own, loved them as such, and in return the children, ignorant of the true facts, loved and accepted the parties as their own parents, calling the husband "Daddy" or "Papa."

Andrew denies that the present case is similar to *Valle,* and points out that the young boy was five years old when brought to live with the Valles, and that the court mentions this point in relation to the fact that the boy was ignorant of the true facts because he was "so young when removed from the family home in Mexico that [he] did not even know or remember [his] natural parents." (53 Cal.App.3d at p. 842.) This, Andrew asserts, establishes a basis from which it may be inferred that Jimmy, at age six years, eight months, is too young to recognize his relationship with Andrew as one of father to son, and therefore that Jimmy could not have relied upon any representation of such a relationship. However, the dictum in *Valle* is more reasonably a recognition on the part of that court that a six-year-long relationship was of sufficient duration for a child of that age to establish the parental relationship cited as necessary by

*Clevenger* before the husband would be estopped from denying paternity.[1] The children in *Valle* had each lived with the Valles longer than they had lived with their natural parents.

The facts here are, in their own way, even more compelling than those in *Valle.* The duration of the parent-child relationship was the same, approximately six years. In this case, however, Andrew assumed the role of Jimmy's father from the very moment of Jimmy's birth and continued to play that role for Jimmy's entire life. Jimmy has known Andrew only as his father and has known no other in that capacity. Although Andrew apparently never expressly represented to Jimmy that he was his father, it is patently clear that his conduct was such that an implied representation to that effect was made and that Andrew intended Jimmy to accept and act upon such representation. It is equally clear that Jimmy was ignorant of the true facts and gave Andrew his love and affection.

Further, although Andrew would make much of the fact that he intended to tell Jimmy the truth when he was old enough to understand, we cannot predicate the absence of so important a responsibility on some future intention. Rather, what this intention shows is the fact that Andrew was entirely aware that Jimmy regarded him as his father, so much so that Andrew felt that he would have to specifically tell him differently or Jimmy would have no reason to believe otherwise than that Andrew was his natural father.

"The relationship of father and child is too sacred to be thrown off like an old cloak, used and unwanted. We are dealing with the care and education of a child during his minority and with the obligation of the party who has assumed as a father to discharge it. The law is not so insensitive as to countenance the breach of an obligation in so vital and deep a relation, undertaken, partially fulfilled, and suddenly sundered." (*Clevenger* v. *Clevenger, supra,* 189 Cal.App.2d 658, at p. 674.)

The judgment is reversed and remanded to the trial court for a determination of the amount of child support.

Ashby, J., and Hastings, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 29, 1979.

---

[1]The court in *Clevenger* restricted the liability of a putative father to a case in which he represents to the child expressly or by implication that he is the child's natural father and the child believes him to be such and where the representation is of such long continuance that the paternal relationship of the putative father and the child is truly established. (*Clevenger* v. *Clevenger, supra,* 189 Cal.App.2d 658, at pp. 674-675.)