510 A.2d 546

**Charles R. KNILL**

v.

**Cledythe I. KNILL.**

**No. 39, Sept. Term, 1985.**

Court of Appeals of Maryland.

June 27, 1986.

528

Gerald F. Gay, John Wheeler Glenn and O'Connor, Preston, Glenn & Smith, P.A., Baltimore, and Edwin F. Nikirk II and Nikirk, Nikirk & Nikirk, on brief, Frederick, for appellant.

Cleopatra Campbell, Frederick, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

COLE, Judge.

We shall decide in this case whether a husband may be required to support a child who, though born to his wife during wedlock, was not sired by him.

We set forth the salient facts as follows. Charles and Cledythe Knill had been married for ten years and had two children at the time of Stephen's birth in 1970. One and one-half years before Stephen's birth, Charles had undergone a full vasectomy, and the parties agree that Stephen is not Charles's son. Charles apparently forgave Cledythe for her infidelity because the marriage continued for another twelve years with Stephen being reared as a member of the Knill family.

During this period, Stephen had no knowledge of his illegitimacy. Cledythe, however, had told her other two children that Charles was not Stephen's father. In the aftermath of a tumultuous family argument in March of 1982, Cledythe informed Stephen that Charles was not his father. Immediately thereafter, Charles attempted to comfort Stephen. Charles admitted to Stephen that he was not

Stephen's father, but that he still loved Stephen. Two years later, Charles and Cledythe separated. Charles continued to support Stephen until January of 1984, when Cledythe sued for divorce in the Circuit Court for Frederick County. Among her prayers for relief, Cledythe requested child support for Stephen. Charles, in turn, denied that Stephen was his natural child and asserted that he was not legally obligated to support him.

In a deposition taken prior to trial, Cledythe testified that a man named James Herring is Stephen's natural father. Mr. Herring, who testified at trial, is a retired federal employee of the Atomic Energy Commission and is also the owner of a gasoline service station. Herring admitted knowing Cledythe, but stated that because of his alleged alcoholism, he could neither admit nor deny paternity. The evidence at trial indicated that Mr. Herring was at all times available for process and financially able to support Stephen. No evidence suggested that Charles had done anything to prevent Mr. Herring from supporting Stephen, or that Charles had at any time during the marriage discouraged Cledythe from pursuing Mr. Herring for support. Moreover, there was no evidence that Cledythe ever sought support from Mr. Herring. The circuit court concluded, nonetheless, that Charles was equitably estopped from denying an obligation to support Stephen. Following a final decree of divorce, Charles appealed to the Court of Special Appeals, claiming that the trial court erred in applying the doctrine of equitable estoppel under the circumstances of this case. We issued a writ of certiorari prior to argument in that court.

Charles contends that no legal basis exists for imposing an obligation upon him to support a child other than his own natural or adopted child. The obligation to provide support, Charles asserts, must be based upon the legal relationship between the two parties. Charles argues that, at most, he stood *in loco parentis* to Stephen during the twelve years that he voluntarily supported him. Charles asserts that because the *in loco parentis* relationship is temporary in

character, he owed no legal duty to continue to support Stephen after the parties separated. On the other hand, Cledythe acknowledges that Charles is not Stephen's father, but maintains that "by his overt behavior," Charles is now equitably estopped to deny paternity. She reasons that Charles "did everything a father would do and more," and that Charles represented himself to the child and to the community as Stephen's father.

# I

■ Maryland Code (1984), § 5–203(b)(1) of the Family Law Article provides, "The parents of a minor child are jointly and severally responsible for the child's support...." The term "parents of a minor child" encompasses both natural and adoptive parents. *See* § 5–308(b) of the Family Law Article. The duty of child support extends to the natural parents of an illegitimate child, but not to a stepparent. *See Bledsoe v. Bledsoe,* 294 Md. 183, 448 A.2d 353 (1982); *Commonwealth of Virginia v. Autry,* 293 Md. 53, 441 A.2d 1056 (1982); *Brown v. Brown,* 287 Md. 273, 412 A.2d 396 (1980). Indeed, a long line of Maryland cases places the responsibility of child support squarely upon the shoulders of the natural parents. *See Bledsoe v. Bledsoe, supra; Brown v. Brown, supra; Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977); *Borchert v. Borchert,* 185 Md. 586, 45 A.2d 463 (1945); *Blades v. Szatai,* 151 Md. 644, 135 A. 841 (1927); *Alvey v. Hartwig,* 106 Md. 254, 67 A. 132 (1907); *Greenwood v. Greenwood,* 28 Md. 369 (1868); *Thompson v. Dorsey,* 4 Md. Ch. Dec. 108 (1853); *Addison v. Bowie,* 2 Bland 575 (1830). Long ago, Sir William Blackstone articulated the rationale underlying this obligation:

[T]he duty of parents to provide for the maintenance of their children, is a principle of natural law; an obligation laid on them not only by nature herself, but by their own proper act, in bringing them into the world: ... By begetting them therefore they have entered into a voluntary obligation to endeavor, as far as in them lies, that

the life which they have bestowed shall be supported and preserved.

1 W. Blackstone, *Commentaries* *447, *quoted in Brown v. Brown, supra,* 287 Md. at 284, 412 A.2d at 402.

Notwithstanding this general rule, Cledythe argues that the child support obligation may be placed on an individual who is not the child's natural parent through the application of the doctrine of equitable estoppel. She claims that the doctrine should be applied to prevent an inequitable and unconscionable result. In other words, she argues that Stephen should not be made to "suffer the ultimate humiliation of having no support from a man who for all purposes acted as a father for fourteen years." Brief for Appellee at 6.

## II

Although the issue has not been considered by this Court, many jurisdictions have addressed the applicability of equitable estoppel in the context of a child support proceeding. *See, e.g., Clevenger v. Clevenger,* 189 Cal.App.2d 658, 11 Cal.Rptr. 707 (1961); *Remkiewicz v. Remkiewicz,* 180 Conn. 114, 429 A.2d 833 (1980); *Fuller v. Fuller,* 247 A.2d 767 (D.C.1968); *R.D.S. v. S.L.S.,* 402 N.E.2d 30 (Ind.App.1980); *Berrisford v. Berrisford,* 322 N.W.2d 742 (Minn.1982); *Miller v. Miller,* 97 N.J. 154, 478 A.2d 351 (1984); *Walton v. Walton,* 282 S.C. 165, 318 S.E.2d 14 (1984); *Wiese v. Wiese,* 699 P.2d 700 (Utah 1985).

In the majority of these cases, the courts have declined to apply the doctrine to estop the husband from denying paternity and an obligation to support the child. *See Remkiewicz v. Remkiewicz, supra* (court held evidence was insufficient to establish elements of equitable estoppel where husband married wife while she was pregnant, executed an affidavit of parentage, and publicly acknowledged that he was child's natural father); *Fuller v. Fuller, supra* (court held husband not equitably estopped to deny support duty absent evidence of misrepresentation of fact causing

prejudice to the child); *R.D.S. v. S.L.S., supra* (court held husband not equitably estopped to deny paternity in support proceedings where husband married wife while she was pregnant by another man and later acknowledged the child as his own); *Berrisford v. Berrisford, supra* (court held husband not estopped from denying paternity in support proceeding where husband married wife while she was pregnant by another man, permitted his name to be used on the birth certificate as the father, and assumed role of father during parties' brief marriage); *Walton v. Walton, supra* (court held husband not equitably estopped to deny paternity in support proceeding where husband married woman while she was pregnant with another man's child, permitted child to use surname, and supported child over eight-year period); *Wiese v. Wiese, supra* (court held husband not equitably estopped from denying liability for support of stepson where record was barren of any evidence that mother had ever approached natural father for support, even though husband had consented to be named as father on birth certificate, had caused decree of divorce between him and mother to reflect that child was the issue of the marriage, and had treated child as his own and supported him).

Two jurisdictions, California and New Jersey, have held that equitable estoppel may apply to estop the husband from denying paternity and a support obligation. *Clevenger v. Clevenger, supra* (court held record before it was insufficient to establish estoppel, but pointed out facts necessary to establish estoppel where husband asserts illegitimacy in denying support obligation); *In re Marriage of Valle,* 53 Cal.App.3d 837, 126 Cal.Rptr. 38 (1975) (court held that evidence was sufficient to find estoppel where husband by his conduct represented to child that he was his father, child relied on such representation and was injured when husband disavowed parental relationship); *Miller v. Miller, supra* (court held husband may be equitably estopped from denying paternity, but only where husband actively interferes with children's support from their natural parent).

**534** 

*See also In re Marriage of Johnson,* 88 Cal.App.3d 848, 152 Cal.Rptr. 121 (1979) (court held husband estopped from denying paternity where he assumed role of child's father from birth and continued to play that role for six years); *M.H.B. v. H.T.B.,* 100 N.J. 567, 498 A.2d 775 (1985) (equally divided court affirmed lower court's judgment that held husband was equitably estopped to deny support of wife's illegitimate child born during parties' marriage).

## III

The definition of equitable estoppel that has been consistently applied in Maryland is as follows:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

3 J. Pomeroy, *Equity Jurisprudence,* § 804 (5th ed. 1941), *quoted in Leonard v. Sav-A-Stop Services,* 289 Md. 204, 211, 424 A.2d 336, 339 (1981).

 Thus, equitable estoppel requires that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped. *Dahl v. Brunswick Corp.,* 277 Md. 471, 487, 356 A.2d 221, 230–31 (1976); *Savonis v. Burke,* 241 Md. 316, 319, 216 A.2d 521, 523 (1966). Although wrongful or unconscionable conduct is generally an element of estoppel, an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other. *Bean v. Steuart Petroleum,* 244 Md. 459, 224 A.2d 295 (1966); *Travelers v. Nationwide,* 244 Md. 401, 224 A.2d 285 (1966);

*Alvey v. Alvey,* 220 Md. 571, 155 A.2d 491 (1959). Of course, the party who relies on an estoppel has the burden of proving the facts that create it. *Doub v. Mason,* 2 Md. 380, 406 (1852); *First Nat. Bank v. Mayor and City Council,* 27 F.Supp. 444, 454 (D.Md.1939).

 As indicated by the definition set forth above, equitable estoppel is comprised of three basic elements: "voluntary conduct" or representation, reliance, and detriment. These elements are necessarily related to each other. The voluntary conduct or representation of the party to be estopped must give rise to the estopping party's reliance and, in turn, result in detriment to the estopping party. *See Dahl v. Brunswick Corp., supra; Savonis v. Burke, supra.* Clearly then, equitable estoppel requires that the voluntary conduct or representation constitute the source of the estopping party's detriment.

In *Clevenger v. Clevenger, supra,* the wife sought support from the husband for an illegitimate child born to the wife during the marriage. The court indicated that an important element in determining estoppel in this situation was whether the husband, during the marriage, had deprived the child of the potential action of the mother, as his guardian, to hold the natural father liable for child support. Under such circumstances, a detriment would inure to the child because of the child's reliance on the husband's representation that he would support the child.

The Supreme Court of New Jersey, in *Miller v. Miller, supra,* recognized that the representation or conduct of the party to be estopped must give rise to the detriment incurred by the estopping party. In *Miller,* the wife sought child support from her husband for her two daughters by a prior marriage. Although the case thus involved stepchildren, its analysis of the application of equitable estoppel is nonetheless instructive. In addressing the wife's estoppel argument, the New Jersey high court set forth the same three-element test for equitable estoppel as enunciated above. The court then declared:

To prove equitable estoppel, the custodial parent has the burden to establish not only representation of support and reliance but also *detriment,* i.e., that the children will suffer future financial detriment *as a result of the stepparent's representation or conduct that caused the children to be cut off from their natural parent's financial support.*

*Id.* at 168, 478 A.2d at 358 (emphasis supplied). The court refused to permit the establishment of estoppel based upon a showing of representation and reliance without the element of detriment, because "no court has ever applied equitable estoppel to force a husband to support the children of his divorced spouse merely because he developed a close relationship with the children, nurtured them into a family unit with himself as the father, and had the children call him 'daddy.' " *Id.*

Indeed, the evidence in *Miller* showed that the husband refused all offers from the children's natural father to contribute to their support and even tore up a check tendered for that purpose. Notwithstanding such evidence, the court required the wife, before looking to the stepfather for child support, to bring the natural father before the court and to seek child support from him. In so doing, the *Miller* court emphasized that "the natural parent should always be considered the primary recourse for child support because society and its current laws assume that the natural parent will support his or her child." *Id.* at 169, 478 A.2d at 359. The court limited the application of equitable estoppel to situations where "a stepparent by his or her conduct actively interferes with the children's support from their natural parent." *Id.*

### IV

■ We turn now to the application of the doctrine of equitable estoppel to the facts of the instant case. We believe that the estoppel elements of representation and reliance are present here. Although there was no evidence that Charles ever expressly told Stephen that he was his

father, such a representation was implicit in Stephen's twelve-year relationship with Charles as a fully-supported member of the Knill family. In common with the Knills' other two children, Stephen used the Knill surname and was so known in the community in which the Knills resided. We therefore think it reasonably inferable that Charles intended that Stephen consider him as his father. As to the reliance element, the record discloses that Stephen believed that Charles was his father until his mother, in apparent anger, told Stephen that Charles was not his father. Plainly, Stephen was relying upon Charles for support until this point in time.

The evidence in this case, however, fails to demonstrate any financial detriment incurred by Stephen as a result of Charles's course of conduct during their twelve-year relationship. Indeed, if any detriment was incurred by Stephen, it was emotional and attributable to his mother. It was she who ripped the "cloak of legitimacy" off the boy following a family dispute, when she revealed to him that Charles was not his father, a fact she had not concealed from the rest of the family. Charles's attempt to console Stephen demonstrates his concern for Stephen's emotional well-being.

In any event, Stephen incurred no financial loss as a result of his relationship with Charles. The evidence fails to support even an inference that Charles's voluntary support caused Cledythe to forego the possibility of pursuing support from Stephen's natural father. Because there is no longer any statute of limitations in paternity cases, Cledythe may still bring a paternity action against Stephen's natural father and establish his duty to support.[1] *Cf.*

---

**1.** In *Frick v. Maldonado,* 296 Md. 304, 462 A.2d 1206 (1983), we relied upon the Supreme Court's decision in *Pickett v. Brown,* 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) in concluding that Maryland's then existing two-year statute of limitations in paternity cases (§ 5–1006 of the Family Law Article) was unconstitutional as denying equal protection of the law to illegitimate children. By ch. 451 of the Acts of 1985, the legislature repealed the unconstitutional provision. The legislative history underlying the enactment of ch. 451 clearly demonstrates

*Clevenger v. Clevenger, supra* (court noted that husband's representation that he was the father deprived the child of mother's potential action to hold natural father liable for support). The availability and accuracy of genetic testing refutes any suggestion that the passage of time has compromised the likelihood of a successful paternity action on Stephen's behalf against his natural father.[2] Therefore, we think Cledythe is obliged to look to the natural father as the source of support for Stephen.

Nonetheless, Cledythe maintains that, unless the court finds an estoppel, Stephen will suffer the "ultimate humiliation of having no support from a man who for all purposes was his father for fourteen years." We do not believe, however, that this loss or injury is the type of detriment that gives rise to equitable estoppel. Here, the detriment that must be established is a financial loss.

In this case, Charles knew that Stephen was not his son and, nevertheless, treated him as his son and as a member of the Knill family. Such conduct is consistent with this State's public policy of strengthening the family, the basic unit of civilized society. We encourage spouses to undertake, where feasible, the support, guidance, and rearing of

---

that there is no longer any statute of limitations in paternity cases and that an action may be brought until the child is 18 years of age. In this regard, we note that Congress, by Pub.L. No. 98–378, enacted in 1984, required that all states adopt procedures to permit "the establishment of the paternity of any child at any time prior to a child's eighteenth birthday." *See* 42 U.S.C.A. § 666 (1983, 1985 Cum.Supp.).

2. The legislature, by enacting Chapter 784 of the 1982 Laws of Maryland, recognized the advances made in the science of genetic testing and the impact of these advances in paternity suits. Chapter 784, now codified at Maryland Code (1984), § 5–1029(e) of the Family Law Article, authorizes the use of blood testing that is "sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers and the statistical probability of the alleged father's paternity is at least 97.3%." *Id.* This 97.3% figure is in recognition of the development of a test system known as Human Leukocyte Antigens (HLA), which produces a 97.3% mean probability of exclusion of non-fathers. *See Haines v. Shanholtz*, 57 Md.App. 92 468 A.2d 92 (1984), *cert. denied*, 300 Md. 90, 475 A.2d 1201 (1984).

their spouses' children, so long as such conduct does not deprive the children of their right to support from their natural parents. Here, Charles demonstrated his regard for Stephen as a part of his family without depriving him or his mother of the right or opportunity to seek legal support from his natural father. We believe that he should not be penalized for his conduct under the circumstances as described. Thus we hold that Charles is not equitably estopped to deny a duty to support.

JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED. APPELLEE TO PAY THE COSTS.

MURPHY, Chief Judge, dissenting:

The majority holds that the doctrine of equitable estoppel may not be applied to estop a husband from denying a duty to support an illegitimate child born to his wife by another man during the marriage unless the husband's voluntary conduct in treating the child as his own gives rise to reliance by the child upon such conduct and results in the child's suffering financial or economic loss as distinguished from emotional or other detriment. Because Stephen's mother may still initiate a paternity action for child support against the putative father, notwithstanding the expiration of sixteen years since Stephen's birth, the Court concludes that Stephen did not incur the requisite financial detriment when Charles disavowed his long-continuing voluntary representation that he was Stephen's natural father and declined thereafter to further support him. I think the majority is dead wrong. Most respectfully, therefore, I dissent.

## I.

Cledythe and Charles Knill were married November 23, 1960. As a result of the marriage, two children were born; both are now adults. On April 4, 1970, during the marriage, a third child, Stephen, was born. Charles knew that he was not Stephen's father. The natural father, according to Cledythe, was James Herring, a former co-worker. Cle-

dythe never made any effort to have Herring declared as Stephen's father.

Charles was named as Stephen's father on the birth certificate. He acknowledged treating Stephen as "one of the family" and he fully supported him. In common with the Knills' other two children, Stephen used the Knill surname and was thereby so known in the community in which the family resided. Charles named Stephen as his son and chief beneficiary in his Last Will and Testament.

Stephen believed that Charles was his father for twelve years until March of 1982 when, following a family dispute, Cledythe told Stephen that Charles was not his father. Charles nevertheless continued to support Stephen as his natural son until January of 1984 when Cledythe sued for divorce in the Circuit Court for Frederick County. Among her prayers for relief, Cledythe sought an order requiring that Charles continue to support Stephen. After a hearing, the court (Barrick, J.) held that even though Charles was not Stephen's natural father, he was, in the circumstances, equitably estopped "from asserting the illegitimacy of the child in order to avoid his support."

## II.

Estoppel is cognizable at common law either as a defense to a cause of action or to avoid a defense. *See Leonard v. Sav-A-Stop Services*, 289 Md. 204, 212, 424 A.2d 336 (1980); *Impala Platinum v. Impala Sales*, 283 Md. 296, 322, 389 A.2d 887 (1978); *Bitting v. Home Ins. Co.*, 161 Md. 56, 60, 155 A. 329 (1931). The definition of equitable estoppel in Maryland, as these cases point out, and as the majority readily acknowledges, is that contained in 3 J. Pomeroy, *Equity Jurisprudence*, § 804 (5th ed. 1941):

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good

faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

From this definition, the majority correctly recognizes that equitable estoppel is comprised of three elements: voluntary representation, reliance and detriment. The majority also recognizes that it is essential for the application of the doctrine of equitable estoppel in Maryland "that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped," citing *Dahl v. Brunswick Corp.*, 277 Md. 471, 487, 356 A.2d 221 (1976) and *Savonis v. Burke*, 241 Md. 316, 319, 216 A.2d 521 (1966). And, as further acknowledged by the majority, "an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other," citing *Bean v. Steuart Petroleum*, 244 Md. 459, 224 A.2d 295 (1966); *Travelers v. Nationwide*, 244 Md. 401, 224 A.2d 285 (1966) and *Alvey v. Alvey*, 220 Md. 571, 155 A.2d 491 (1959).

There is thus nothing in the Maryland law of equitable estoppel delineating financial or economic as the only type of detriment which permits of the doctrine's application. Furthermore, Stephen did suffer obvious financial detriment because of Charles' abrupt abandonment of his long-continuing course of voluntary conduct in representing to Stephen, and to the community, that Stephen was his fully supported natural son. But even assuming the absence of such financial detriment, the doctrine of equitable estoppel would not thereby be rendered inapplicable in this case.

## III.

Absent adoption, a husband is not ordinarily bound to support an illegitimate child born to his spouse by another man during the marriage. *See* cases collected in Annot., *Liability of mother's husband, not the father of the ille-*

*gitimate child, for its support,* 90 A.L.R.2d 583 (1963); 10 C.J.S. *Bastards* § 18 (1938); 10 Am.Jur.2d *Bastards* § 67 (1963). A number of courts, however, applying principles of equitable estoppel, have recognized that in some circumstances the husband of a woman who during the marriage gave birth to a child by another man may be held legally responsible for the child's support after the termination of the marriage. The leading and seminal case is *Clevenger v. Clevenger,* 189 Cal.App.2d 658, 11 Cal.Rptr. 707 (1961). There, a husband supported and acted for over a decade as father to an illegitimate child born to his wife during the marriage. Upon termination of the marriage, the wife sought child support from the husband, claiming that he was estopped to assert the illegitimacy of the child and thereby avoid liability for the child's support. In its opinion, the court undertook to define "the duty of support which a husband owes to his wife's illegitimate child when the husband, from the date of the birth of the child, accepts the child into his family, publicly acknowledges the child as his own and treats the child as if he were legitimate." 189 Cal.App.2d at 662, 11 Cal.Rptr. 707. At the outset of the court's opinion, Justice Tobriner remarked that there is "an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon, his bastardy." *Id.* at 664, 11 Cal.Rptr. 707. The court said that if any legal hypothesis can prevent such an inducement to publication of illegitimacy, it should be adopted. Thus, it said, if the facts would establish an estoppel as to the child, the husband would be liable for the child's support. Such an estoppel would be established if the facts showed

> "that the husband represented to the boy that he was his father, that the husband intended that his representation be accepted and acted upon by the child, that the child relied upon the representation and treated the husband as his father and gave his love and affection to him, [and]

that the child was ignorant of the true facts...." *Id.* at 670, 11 Cal.Rptr. 707.

Considering these factors, the court said that the benefits to the husband in such an instance would be

"(1) the bestowal upon him of the love and affection of the child as a natural child, based upon the representation that the husband was the natural father, (2) the substitution of the husband in the status of father in the place of the natural father, so that the putative father would have the possession and custody of the child instead of the natural father, and the right to the child's earnings, (3) the community's recognition of the husband as a father, a status from which appellant undoubtedly derived prestige and fulfillment." *Id.* at 671, 11 Cal.Rptr. 707.

The court further noted that a husband's representation that he was the child's natural father would cause these consequences and detriments to the child:

"(1) It would deprive the child of the potential action of the mother, as his guardian, at the time of the child's birth, to hold the natural father liable for the support of the child. The child thus relies upon the husband's representation and does not attempt to find the natural father.... This reliance works a definite detriment to the child. (2) It would induce the child to accept the husband as his natural father and render to him the affection and love of a son, with the son's reasonable expectation of care, support and education until adulthood. The reversal of this representation, through the publication of the illegitimacy of the child, inflicts deep injury upon him. To be designated as an illegitimate child in preadolescence is an emotional trauma of lasting consequence. Having placed the cloak of legitimacy upon the child, having induced the child to rely upon its protection, the husband by abruptly removing it surely harms the child. The child has therefore relied on the conduct of the husband to his injury. (3) It would induce the child to hold himself out to the community as the natural son of the husband ...,

only to suffer the abrupt removal of that status, and to undergo the subsequent social injury." *Id.*

While the record in *Clevenger* showed that the husband accepted the child into his family and publicly acknowledged and treated him as his own for eleven years, the court found no evidence "that the husband made a direct or implied representation to the child that he was the boy's father." *Id.* at 670–71, 11 Cal.Rptr. 707. The court said that the estoppel must be found to run in favor of the child, rather than the mother, and predicated "upon the child's acceptance of the representation of the putative father that he is the natural father." *Id.* at 674, 11 Cal.Rptr. 707. The husband's liability, the court reiterated, is restricted "to the case in which he represents to the child expressly or by implication that he is the child's natural father and the child believes him to be the natural father." *Id.* at 674, 11 Cal.Rptr. 707. Moreover, the court cautioned that to hold the husband legally responsible for the child's support, the husband's representation "must be of such long continuance that it frustrates the realistic opportunity of discovering the natural father and truly establishes the paternal relationship of the putative father and child." *Id.* at 675, 11 Cal.Rptr. 707. The court concluded, on the record before it, that there was an insufficient basis to find an estoppel against the husband.

As already indicated, the evidence in the present case is that Charles represented to Stephen for twelve years, and to the community at large for fourteen years, that Stephen was his natural son. Although largely devoid of evidentiary detail, it is reasonably inferable from the record in this case that Charles intended that Stephen consider him as his natural father and that Stephen did so for twelve years. Charles' motivation in accepting Stephen as his own son is not disclosed by the record. It may have been that Charles wished to maintain the integrity of the family unit, to avoid personal or family humiliation, to avoid embarrassment to Cledythe, or for other reasons. But whatever Charles' reason, the fact remains that he represented himself as

Stephen's natural father for a long period of time, during which he benefitted from Stephen's love and affection, and from the community's acceptance of Stephen as a member of the Knill family. And because of Charles' representations, Stephen for many years had no opportunity to discover the identity of his real father, to establish a paternal relationship with him, or to seek support from him through a paternity action or otherwise.

Other California intermediate appellate court cases, applying *Clevenger* principles, have concluded that the evidence was sufficient to impose child-support liability upon a nonbiological father, based upon estoppel principles, *i.e.*, that the husband by his conduct represented to the illegitimate child that he was his father, intended that such a representation be accepted and acted on by the child and the child, ignorant of the true facts, relied on the representation and treated the husband as his father, thereby suffering injury when the husband disavowed the parental relationship. *See In Re Marriage of Valle*, 53 Cal.App.3d 837, 126 Cal.Rptr. 38 (1975); *In re Marriage of Johnson*, 88 Cal. App.3d 848, 152 Cal.Rptr. 121 (1979).

In *Valle*, a husband and wife brought two children from Mexico on forged birth certificates, knowing that the husband's brother was the natural father. The husband and wife represented the children as their own for a period of six years. Nevertheless, when the husband and wife divorced, the husband appealed the award of child support against him on the ground that he was not the children's natural father. Applying *Clevenger* principles, the court stated that the husband could be estopped from denying liability for child support if his "representation was of such duration that it frustrated the realistic opportunity to discover the natural father and to reestablish the child-parent relationship between the child and the natural father." 53 Cal.App.3d at 841, 11 Cal.Rptr. 707. The court emphasized that the children "were so young when removed from the family home in Mexico that they did not even know or remember their natural parents" and that "a true paternal

relationship" had been established between the husband and the children. *Id.* at 842, 11 Cal.Rptr. 707.

In *Johnson,* an illegitimate child was born to the wife ten days before the parties were married. For a period of six years thereafter, the husband represented himself as the child's father, although he said that he did so only for a religious purpose. In holding the husband estopped from denying a duty to pay child support, the court placed importance on the fact that he "assumed the role of Jimmy's father from the very moment of Jimmy's birth and continued to play that role for Jimmy's entire life," and that the child had known the husband "only as his father and has known no other in that capacity." 88 Cal.App.3d 852, 152 Cal.Rptr. 121.

In neither *Valle* nor *Johnson* did the court inquire into the identity of the natural father or the viability of an action against him for child support. Clearly, therefore, the doctrine first announced in *Clevenger* has been interpreted by subsequent California cases to not require courts to make such an inquiry when (1) the husband's representations of fatherhood are of such duration that a true paternal relationship exists between the husband and the child and where (2) a realistic opportunity to establish such a relationship with the natural father no longer exists. Indeed, as so forcefully recognized in *Clevenger,* nothing could be more devastating to the fragile psychology of a child than the sudden breach of a long-established paternal relationship followed by being proclaimed a bastard and left without a father. To trivialize harm so profound in its effect by requiring financial or economic detriment as a necessary ingredient of estoppel is beyond all reason and is not consistent with Maryland law.

In almost every illegitimate child case that has declined to apply estoppel against a husband, the absence of the kind of harm that necessarily flows from the sudden termination of an established paternal relationship is pivotal in the court's reasoning. In *Berrisford v. Berrisford,* 322 N.W.2d 742

(Minn.1982), the husband "assumed a parental role during the relatively short period the parties lived together" and the child was so young that she "could not have given thought to the nature of the relationship." *Id.* at 745. In *Albert v. Albert*, 415 So.2d 818 (Fla.Dist.Ct.App.1982), the child was only one and a half years of age at the time of the divorce and the court concluded that estoppel was not appropriate where "the only misrepresentation relied upon is that given in an original birth certificate application." *Id.* at 820. There were insufficient representations causing detriment to the child in *S.E.M. v. D.M.M.*, 664 S.W.2d 665 (Mo.Ct.Ap.1984) because the "husband and wife separated for the last time approximately eight months after the child's birth." *Id.* at 667. There was insufficient evidence of representations on which a child, who was two years of age at the time of the divorce, could have relied upon in *Fuller v. Fuller*, 247 A.2d 767 (D.C.1967). Finally, in *Walton v. Walton*, 282 S.C. 165, 318 S.E.2d 14 (1984), "the husband's friendly behavior toward the child, who knew the identity of his true father, should not be construed as a misrepresentation." 318 S.E.2d at 16.[1] Given the emphasis placed on the lack of a true paternal relationship on which the child could have relied, these cases clearly imply that had a true paternal relationship existed the emotional detriment suffered by the child would have been sufficient to estop the husband.[2]

To support its position that emotional harm suffered by a child is an insufficient detriment, and that financial detri-

---

**1.** Only in *H.P.A. v. S.C.A.*, 704 P.2d 205 (Alaska 1985) is the nature of the parental relationship between the husband and the child not pivotal in the court's decision not to apply estoppel because in that case misrepresentations by the wife may have led the husband to believe that he was the natural father of the child. *Id.* at 208–09.

**2.** Two courts appear to have rejected estoppel as a basis for holding a husband liable for supporting an illegitimate child born to his wife by another man under any circumstances. *See Remkiewicz v. Remkiewicz*, 180 Conn. 114, 429 A.2d 833 (1980); *R.D.S. v. S.L.S.*, 402 N.E.2d 30 (Ind.App.1980).

ment must be established before principles of estoppel may be invoked, the majority relies upon two cases that have considered whether a stepfather can be equitably estopped from denying liability to provide child support to stepchildren born to his wife during a prior marriage. In the first case, *Miller v. Miller*, 97 N.J. 154, 478 A.2d 351 (1984), the parties were married in 1972. The wife had two daughters by a prior marriage. In later divorce proceedings, the wife sought child support from the husband for her daughters, claiming that the husband, by his actions, had induced the girls to rely on him as their natural father to their emotional and financial detriment, thereby inhibiting the girls' relationship with their natural father. While concluding that in appropriate cases a child support obligation may be imposed on a stepparent on the basis of equitable estoppel, the court said that the record was insufficient to permit a determination whether a permanent support obligation should be imposed.

The evidence in that case showed that the daughters knew that the husband was not their natural father. It also disclosed that the stepparent had consistently refused to permit the natural father to financially support his stepchildren and, as a result, the father did not support them. There was evidence that for the seven years that the parties lived together the husband developed a loving relationship with the stepchildren who used his surname and referred to him as "daddy."

The court held that the burden of proof of a claim of equitable estoppel rests upon the party asserting estoppel, who must show "that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action ... [and] the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment." *Id.* 478 A.2d at 355. The three prerequisites to equitable estoppel, the court said, were representation, reliance and detriment. *Id.* at 358. Citing *Clevenger* and two intermediate appellate court cases

in New Jersey, the court concluded that equitable estoppel would be appropriately applied in some child support cases, but that the doctrine had to be applied with caution so as not to discourage voluntary support by a nonbiological father. At one point in its opinion the court noted that in some cases where the husband married a woman who was either pregnant by another man or gave birth to an illegitimate child during the marriage, and the husband represented himself both to the child and the community as the natural father, principles of equitable estoppel may be applied in furtherance of the general policy against allowing parents to testify to the illegitimacy of children whom they have previously treated as their own. *Id.* at 357. As to the support of stepchildren, the court said it was essential that the stepparent's conduct be shown to have "actively interfered with the children's support by their natural parent" before the doctrine of equitable estoppel would apply. *Id.* at 358. Further on, the court said that for equitable estoppel to apply "the stepparent must have made some representation of support to either the children or the natural parent as to his or her responsibilities in his or her relationship with them." *Id.* The court said further that equitable estoppel would not be applied to force a husband to support a stepchild upon termination of the marriage "merely because he developed a close relationship with the children, nurtured them into a family unit with himself as the father, and had the children call him 'daddy.'" *Id.* Nor would "the development of emotional bonding" be sufficient to invoke equitable estoppel principles in stepparent cases since, if it was, "[a] stepparent who tried to create a warm family atmosphere with his or her stepchildren would be penalized by being forced to pay support for them in the event of a divorce." *Id.* To prove equitable estoppel, the court said, requires an affirmative showing to establish

"not only representation of support and reliance but also detriment, *i.e.*, that the children will suffer future financial detriment as a result of the stepparent's representa-

tion or conduct that caused the children to be cut off from their natural parent's financial support." *Id.*

And, finally, the court stressed that where a nonbiological father actively interferes with the child's support from his natural parent, the stepparent may be equitably estopped from denying a duty to support since, in such circumstances, the child would have incurred detriment as to his future support by previous reliance on the stepfather for support. *Id.* at 359.

Similarly, in *Wiese v. Wiese*, 699 P.2d 700 (Utah 1985), the court, citing *Clevenger*, and relying extensively upon *Miller*, declined to apply the doctrine of equitable estoppel to impose a duty of child support upon a nonbiological father. In that case, the husband married a divorced woman who was then pregnant with a child presumed to be that of her former husband. The second husband permitted his name to be used on the birth certificate as the child's father in order to give the child "a name" and he supported the child during the parties' brief marriage. In a subsequent divorce action, the stepfather stipulated that the child was the "issue of the marriage" but upon the wife's seeking child support, he disclaimed that he was the child's natural father. The court noted that the party asserting equitable estoppel bears the burden of showing that the stepfather's actions have precluded the obtaining of support from the natural father. The court said that there was insufficient evidence establishing the essential prerequisites of equitable estoppel, *i.e.*, representation, reliance and detriment. The mere fact that the stepfather treated the child as his own and supported him was insufficient, the court explained, to impose a duty of support, particularly since there was no evidence that the child could not seek support from his biological father.

The majority states that although *Miller* "involved stepchildren, its analysis of the application of equitable estoppel is none the less instructive." While *Miller* may indeed be instructive, at most it is authority for requiring economic detriment in those cases where the child was the issue of a

prior marriage and is the natural child of the prior husband. Certainly, where a prior husband stands ready to pay child support for a legitimate issue of his prior marriage to the mother, no one can doubt the wisdom of requiring that child support be sought from the prior husband unless the children's stepfather has made substantial representations causing financial detriment to the stepchild, *i.e.*, by interfering with the stepchild's financial support from the natural father. Furthermore, in such cases, the mother does not suffer the humiliation of seeking out her paramour to obtain child support, nor is the child thereby bastardized. Moreover, had there been no finding of financial detriment in *Miller*, the children would have been free to resume their paternal relationship with their natural, legitimate father whom they already knew. Likewise, the three-year-old child in *Wiese* may now turn to his legitimate father for paternal guidance.

That a great difference exists between stepchild cases and cases involving illegitimate children is clear from *M.H.B. v. H.T.B.*, 100 N.J. 567, 498 A.2d 775 (1985). That case, decided by the same court that decided *Miller*, involved a claim against a husband, based on principles of equitable estoppel, for support of a child born during the parties' marriage but fathered by another man. There, the parties were married in 1966 and had two natural children. In 1977, the wife gave birth to an illegitimate child after which the husband, who knew the child was not his own, left the marital home. The marriage continued for three years after the separation. For six months during this period, the wife cohabitated with the illegitimate child's father. In subsequent legal proceedings, an equally divided Supreme Court of New Jersey affirmed a lower court judgment that the doctrine of equitable estoppel precluded the husband, upon termination of the marriage, from denying a duty to support the wife's illegitimate child.

Three justices, in an opinion by Justice Handler announcing the judgment of the court found from the evidence that the child's total filial dependence was upon the husband

whom she believed to be her natural father; that throughout the marriage, and for some years thereafter, the husband permitted the child to use his surname; that he consistently conducted himself as the child's father and so represented this relationship to her, treating her as one of the family; that the husband successfully gained the child's love and affection; and that he established himself as the child's parental provider of emotional and material support. Justice Handler's opinion stated that the husband's actions "attest to the previously well-developed father-daughter bond, and convey all possible indicia of an affirmative and purposeful representation of continuing support, which constitutes a primary element of equitable estoppel." 498 A.2d at 778. Reliance upon the husband's "purposeful conduct" was also established, Justice Handler said, and resulted in the child's reasonable belief that the husband was her natural father. Continuing, the opinion stated that if the husband was permitted to disavow the parent-child relationship "that he created and fostered and to repudiate the parental responsibility that flowed from that relationship ... [the child] would suffer demonstrable harm fully commensurate with her dependent condition." *Id.* at 779.

Justice Pollock, for himself and two other justices, took a different view of the evidence, particularly as to the extent of the husband's representations to the child and the effect of his conduct, stating that the husband's relationship with the child was "always ambivalent." *Id.* at 782. This opinion noted that in the eight years that had elapsed since the child's birth the husband spent but a total of fourteen months with her. Justice Pollock said there was no evidence that the husband ever interfered with the natural father's relationship with the child and that where he is known and can be located, the natural father bears the financial responsibility to support the child. The opinion concluded that there was no basis upon which to apply the doctrine of equitable estoppel in the circumstances of the case to require the husband to support the wife's illegitimate child, upon termination of the marriage.

There is, of course, nothing ambivalent about Charles' paternal relationship with Stephen. They lived together under the same roof for twelve years, with Charles representing to the child throughout that extended period that he was his natural father—a representation also implicitly made to the community in which they lived for fourteen years. That Charles fostered a true paternal relationship with Stephen cannot be doubted. Notwithstanding the accuracy of genetic testing, it is not reasonable to expect Stephen, after the passage of sixteen years, to establish a paternal relationship with another man who, because of his claimed drunkenness, has no recollection one way or the other whether he ever engaged in sexual intercourse with Stephen's mother.

The majority recognizes that the estoppel elements of representation and reliance are clearly present in this case. And while it cites cases where the husband was not estopped to deny paternity and liability for child support, those cases, and others, do recognize, implicitly or explicitly, that a husband may be estopped under certain circumstances which do not involve a requirement of financial detriment. *See H.P.A. v. S.C.A.,* 704 P.2d 205 (Alaska 1985); *Fuller v. Fuller,* 247 A.2d 767 (D.C.1967); *Albert v. Albert,* 415 So.2d 818 (Fla.Dist.Ct.App.1982); *Berrisford v. Berrisford,* 322 N.W.2d 742 (Minn.1982); *S.E.M. v. D.M.M.,* 664 S.W.2d 665 (Mo.Ct.App.1984); *Walton v. Walton,* 282 S.C. 165, 318 S.E.2d 14 (1984).

It is readily evident that Stephen suffered financial and emotional detriment by reason of Charles' decision to renounce Stephen's legitimacy and to disclaim responsibility for his support. As a result, Stephen finds himself suddenly devoid of paternal support and of community acceptance as a legitimate member of the Knill family. After so many years, and with Stephen fast approaching his eighteenth birthday, the likelihood of a paternity action being filed against Stephen's natural father, or if filed, being successful, is scant indeed.

I recognize, of course, that Charles was under no duty to disclose Stephen's illegitimacy to him. His silence in this regard was, in itself, neither wrongful nor unconscionable. But in the final analysis, the effect of Charles' continuous course of conduct over so many years renders it inequitable for him now to deny Stephen's legitimacy and a responsibility for support to Stephen's eighteenth birthday. To so estop Charles, in the circumstances of this case, is not affirmatively to impose a duty of child support upon him. That duty is placed upon Charles, not directly by the application of the estoppel itself, but rather because his voluntary assumption of the parental role over such an extended period now precludes him from disavowing parental responsibility for child support.

SMITH and ELDRIDGE, JJ., have authorized me to state that they concur with the views expressed herein.