594 A.2d 577

Donald P. MONROE

v.

Patricia Thomas MONROE.

No. 2033, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Aug. 27, 1991.

Certiorari Granted Dec. 12, 1991.

Ann M. Turnbull (Joseph J. Wase and Turnbull, Wase & Lyons, P.A. on the brief) Towson, for appellant.

Patricia Thomas Monroe of Memphis, Tenn. (Robert M. Winegrad, Stephen S. Winegrad and Kantor & Winegrad on the brief), Owings Mills, for appellee.

Argued before BISHOP, ROSALYN B. BELL, and FISCHER, JJ.

BISHOP, Judge.

In September 1989, Donald P. Monroe, appellant, filed a Complaint for Limited Divorce. Appellant's wife, Patricia T. Monroe, appellee, subsequently filed a Counter-complaint for Absolute Divorce. The parties entered into a Voluntary Separation and Property Settlement Agreement, an Amended Marital Settlement Agreement and two Consent Orders which provided for joint custody of their only minor child and support payments. This case arises out of a dispute regarding the issue of temporary custody of the child.

## Issues Presented

Appellant raises the following three issues:

I. Whether the trial court erred in requiring appellant to submit to a blood test;

II. Whether the trial court erred in admitting the results of the blood test into evidence; and,

III. Whether the trial court erred in changing custody from appellant to appellee on the basis of the blood test which excluded appellant as the biological father of the child.

Since we find that the trial court erred in requiring appellant to submit to a blood test, we also conclude that the results of the blood test should not have been admitted into evidence, and that custody should not have been changed on the basis that the blood test excluded appellant as the biological father of the child. We also deny the various motions that have been filed during the pendency of this appeal since they become moot as a result of our disposition of this case.

*Facts*

Donald Monroe, appellant, and Patricia Monroe, appellee, met and began to date in the fall of 1984. In the spring of 1985, appellee learned that she was pregnant and she informed appellant that he was the father of the unborn child. To reassure him, appellee took a "voice stress analysis test" with a licensed investigator who advised the parties that, based on the results of the test, appellee believed that appellant was the father of the baby. The parties began living together and, in December of 1985, appellee gave birth to a baby girl. Appellant was present in the delivery room during the birth and his name appears on the child's birth certificate as her father. Eventually, the parties were married in May of 1988 when the child was approximately two and a half years old.

Several months after they were married, the parties had an argument. Mrs. Monroe left the home and stayed with relatives in Delaware. Mrs. Monroe then told Mr. Monroe that he was not the father of her child. Mr. Monroe responded by filing a Motion for a Blood Test in the Circuit Court for Baltimore County. According to Mr. Monroe, this motion was filed in order to get Mrs. Monroe to return home. The Motion was never pursued and the case was dropped when Mrs. Monroe returned home from Delaware.

The parties continued to live together intermittently until July 1989 when they separated by mutual consent. They entered into a Voluntary Separation and Property Settlement Agreement in which they agreed, *inter alia,* that the child "born to the parties prior to their marriage" would be in their joint custody and that her primary residence would be with Mrs. Monroe, with specified visitation rights for Mr. Monroe. The Agreement further provided that neither party was to "move out of the State of Maryland with the child with the intent of establishing a residence in another state, unless that move is previously consented to in writing by the other party." Mr. Monroe also agreed to pay the mortgage and other bills and allow Mrs. Monroe and the child to occupy his home for one year on the condition that

Mrs. Monroe not rent out space in the home, or allow anyone other than herself and the child to reside in or occupy the home on a permanent basis.

According to Mrs. Monroe's testimony, sometime in the fall of 1989 her daughter alleged that Mr. Monroe had abused her. The Child Advocacy Center for Baltimore County conducted an investigation and concluded that the allegations were unsubstantiated.

Also in the fall of 1989, the parties entered into a Consent Order which continued joint custody of the child and Mr. Monroe's visitation rights. In February of 1990, the parties entered into a second Consent Order which provided that the parties and the child were to be evaluated by a psychologist or psychiatrist mutually selected by the parties, at Mr. Monroe's expense, who was to make recommendations as to custody and visitation. The second Consent Order also provided for Mr. Monroe to increase his child support payments and to pay for certain other expenses for the child. Shortly after the entry of the second Consent Order, the parties and the child began to be evaluated by Dr. Leon Rosenberg, the head of the Division of Child and Adolescent Psychiatry at the Johns Hopkins Hospital.

Sometime in 1990, Mr. Monroe became convinced that Mrs. Monroe's married paramour, Gary Roseman, had moved into the house with Mrs. Monroe and the child. Mr. Monroe also began to suspect that Mrs. Monroe was planning to move out of the state with Gary Roseman and the child. Mrs. Monroe did, in fact, leave the state and Mr. Monroe filed a Motion for Ex Parte Order. The Circuit Court issued an Order awarding temporary and exclusive custody of the child to Mr. Monroe.

The next day, Mrs. Monroe returned to Maryland with the child and an emergency hearing was held before the Circuit Court. Mrs. Monroe testified that her paramour had relocated to Tennessee, that she had gone there temporarily to help him move, and that she left suddenly because she was afraid of Mr. Monroe. She then admitted that she had

contracted with a moving van company at least two weeks earlier and that all the furniture had already left for Tennessee before Mr. Monroe allegedly called and threatened her. The Circuit Court concluded that the temporary custody Order that gave Mr. Monroe temporary and exclusive custody would remain in effect until an evidentiary hearing was held.

Prior to the hearing, Mrs. Monroe filed a Motion to Order Blood Test to Establish Paternity in which she alleged, for the first time, in this proceeding, that Mr. Monroe was not the biological father of the child. The Circuit Court issued an Order requiring Mr. Monroe to submit to a blood test for the purpose of establishing paternity. Mr. Monroe filed a Motion for Reconsideration which was denied. Thereafter, as we mentioned previously, he appealed to this Court, but the case was dismissed as an appeal from an interlocutory order. Accordingly, Mr. Monroe complied with the court's Order and submitted to a blood test, the results of which excluded him as the biological father of the child.

On July 30, 1990, a hearing was held before a master at which both parties, and numerous other witnesses, testified. At the beginning of the hearing, Mr. Monroe objected to the results of the blood test being admitted into evidence. His objection was overruled and the results of the test were admitted. At the conclusion of the hearing, the master recommended that temporary custody of the child be continued with Mr. Monroe and that the child was not to be removed from the State of Maryland. The master also recommended that Mrs. Monroe be evaluated by Dr. Michael Spodak, that Dr. Leon Rosenberg continue to see the child, and when Mrs. Monroe is in Baltimore, that she have visitation with the child for the first forty-eight hours and thereafter on a fifty-fifty basis with Mr. Monroe at forty-eight hour intervals.

Mrs. Monroe filed Exceptions to the master's ruling on the issue of custody and Mr. Monroe filed Exceptions to the master's ruling that the blood test be received into evidence. On November 29, 1990, a hearing on both parties' Excep-

tions was held before the Honorable Dana M. Levitz. Judge Levitz issued a written Opinion which denied Mr. Monroe's Exceptions and granted Mrs. Monroe's Exceptions, thereby changing custody of the child to her mother. Judge Levitz determined that there was no authority for Mr. Monroe's position that blood tests can only be ordered and admitted in paternity cases. Moreover, he recognized that in this particular case there had been no prior finding of paternity by any court and, accordingly, the master was correct in admitting the blood test into evidence.

Judge Levitz also held that, as a matter of law, there were not sufficient exceptional circumstances to overcome the presumption that, between a biological parent and a third party (Mr. Monroe), the best interest of the child requires custody to be with her biological parent. The Honorable Barbara Kerr Howe stayed Judge Levitz' Order pending appeal. Judge Howe subsequently struck her Order whereupon Judge Levitz denied Mr. Monroe's Motion for Stay. We stayed Judge Levitz' Order pending appeal and, therefore, at the present time, the child continues to reside with Mr. Monroe.

## Discussion

Under the unique facts of this case, we hold that Mrs. Monroe is equitably estopped from using the results of a blood test to bastardize her child in connection with this routine divorce proceeding wherein the basic issue is the termination of the marriage bond—not the paternity of the child. Maryland courts have consistently applied the following definition of equitable estoppel:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part

acquires some corresponding right, either of property, of contract, or of remedy.

*Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986) (citations omitted). Thus, equitable estoppel requires that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party to be estopped. *Id.* This definition of equitable estoppel is comprised of three basic elements: "voluntary conduct" or representation, reliance, and detriment. *Id.* at 535, 510 A.2d 546.

In *Pettinato v. Pettinato,* 582 A.2d 909 (R.I.1990), a case factually identical to the instant case, the Rhode Island Supreme Court recently applied the doctrine of equitable estoppel and concluded that a mother should be equitably estopped from using a blood test to disestablish a child's paternity in connection with a routine divorce proceeding. In that case, the father held himself out to be the child's father, married the mother believing her representation that the child was his, intended to raise the child in a family unit, and consented to being named as the father on the child's birth certificate. The couple lived together and represented themselves to the community as a family.[1]

---

1. The Rhode Island Court held that the foregoing satisfied the requirements of Rhode Island's presumption of paternity statute which contains similar provisions to the following Maryland statute which provides the methods by which a child may be legitimated:

 **§ 1–208. Illegitimate child.**

 (a) *Child of his mother.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his mother.

 (b) *Child of his father.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father

 (1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings; or

 (2) Has acknowledged himself, in writing, to be the father; or

 (3) Has openly and notoriously recognized the child to be his child, or

 (4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.

Similarly, in *Boyles v. Boyles*, 95 A.D.2d 95, 466 N.Y.S.2d 762 (1983), the court concluded that "for public policy reasons, respondent, having held her child out as the legitimate son of her husband for a substantial period of time, should be precluded from thereafter bastardizing the child for the sole purpose of furthering her own self-interest in obtaining exclusive custody of the child." *Id.* 466 N.Y.S.2d at 765.

As in *Pettinato* and *Boyles*, the circumstances of the case before us compel the application of the doctrine of equitable estoppel. Throughout the child's life, Mrs. Monroe voluntarily represented to Mr. Monroe that he was the child's father. The three lived together and represented themselves to the community as a family. Mrs. Monroe represented to the circuit court that Mr. Monroe was the child's father, accepted child support from him, and permitted and indeed encouraged Mr. Monroe to act as the child's father. In fact, Mr. Monroe is the only father the child has ever known.

Moreover, in child custody cases, the overriding consideration is the best interest of the child. This best interest standard is firmly entrenched in Maryland and is deemed to be of transcendent importance. *Ross v. Hoffman*, 280 Md. 172, 174–75, 372 A.2d 582 (1977). Regardless of whether the dispute is between biological parents or between a biological parent and a third-party,[2] the best interest of the child standard is always determinative in child custody disputes. *Id.* at 177–78, 372 A.2d 582

Mr. Monroe justifiably relied on Mrs. Monroe's representations that he was the child's father. Although initially he

---

Md.Est. & Trusts Code Ann. § 1–208 (1991).

**2.** In considering the issue of child custody, a trial court clearly possesses the power to order a party to submit to a blood test. Maryland Rule 2–423 provides that a court may order a party to submit to a physical examination only on motion for good cause shown. Although the right to a physical examination under this Rule is a matter to be granted within the sound discretion of the court, *Hutzell v. Boyer*, 252 Md. 227, 249 A.2d 449 (1969), it may only be granted *for good cause shown.*

had doubts, he reasonably believed himself to be the child's natural father. Relying on Mrs. Monroe's representations and his own reasonable beliefs, Mr. Monroe supported and cared for the child as if she were his natural child. In fact, even though required to fulfill only one of them, Mr. Monroe fulfilled three of the four criteria set forth in Md.Est. & Trusts Code Ann. § 1–208, *supra, note 1.*, so that the child is considered to be the legitimate child of Mr. Monroe. Mr. Monroe has acknowledged himself, in writing, to be the child's father; has openly and notoriously recognized the child as his own; and subsequently married the child's mother and acknowledged himself, orally and in writing, to be the child's father.

Finally, detriment will be incurred by Mr. Monroe and the child if the results of the blood test are used to bastardize the child. The strong father-daughter bond that has existed for five years will be broken and both Mr. Monroe and the child will suffer great emotional loss.

 While we hold that the unique facts of this case compel the application of the doctrine of equitable estoppel, we emphasize that our holding is limited to this particular case. The doctrine of equitable estoppel does not always apply in divorce proceedings where paternity is at issue. For example, the case *sub judice* is factually distinguishable from *Knill v. Knill,* 306 Md. 527, 510 A.2d 546 (1986), in which the Court of Appeals held that a husband was not equitably estopped to deny a duty to support a child that was not his. First, unlike the case before us, *Knill* involved the issue of child support. The husband in *Knill* knew from the beginning that he was not the biological father; however, he elected to treat the child as his own over a long period of time. The parties in *Knill* also knew who the biological father was, so the child was able to obtain support from that man. Finally, the Court in *Knill* found that the child would not suffer any financial detriment. In the case at bar, however, Mr. Monroe reasonably believed the child was his, the biological father has not come forward to assert parental rights, no paternity action

has been commenced, and the child will suffer substantial financial detriment if her relationship with Mr. Monroe is terminated.

The instant case is also factually distinguishable from *In re Erica*, 71 Md.App. 148, 524 A.2d 108 (1987). In *Erica*, DeWitt O., the mother's long-time live-in male companion, sought to participate as a party in an action to remove the child from her home. DeWitt O. admittedly was not the child's father and his claim to participate in the proceeding was based solely on the grounds that he had lived with the child for seven to nine years and that his name was listed as the child's father on the child's school records. If DeWitt O.'s position were correct, a mother could list on school records the name of any male and immediately make the male the "natural father" of the child. The facts of the case *sub judice* are clearly different. In this case, the issue of paternity was raised in a divorce proceeding, whereas *Erica* involved an attempt to participate in a proceeding to remove the child from her home. In addition, Mrs. Monroe voluntarily represented to Mr. Monroe that he was the father of her child and Mr. Monroe reasonably believed he was the child's father. DeWitt O. never asserted he was the biological father of the child. Finally, the parties in the instant case were married whereas DeWitt O. was a long-time, live-in companion.

Considering the unique set of facts in the case before us, we hold that the trial court erred in ordering Mr. Monroe to submit to a blood test, in admitting the results of the blood test into evidence and in changing custody from Mr. Monroe to Mrs. Monroe based on the results of the blood test. Because Mrs. Monroe is equitably estopped from using the results of the blood test to bastardize her child, we reverse the trial court's ruling and remand for further proceedings.

JUDGMENT REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE. MANDATE TO ISSUE FORTHWITH.