661 A.2d 182

**RELAY IMPROVEMENT ASSOCIATION, et al.**

v.

**SYCAMORE REALTY CO., INC.**

**No. 1801, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

July 5, 1995.

702

Peter Max Zimmerman (Carole S. DeMilio, on the brief for appellant, People's Counsel for Baltimore County, J. Carroll Holzer and Holzer and Lee on the brief for appellant, Relay), for appellants.

Thomas M. Wood, IV (Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., Baltimore, and Edward C. Covahey, Jr. (Anthony J. DiPaula and Covahey and Boozer, P.A. on the brief), for appellee.

Argued before WILNER, C.J., and WENNER and DAVIS, JJ.

DAVIS, Judge.

This is an appeal from a judgment in the Circuit Court for Baltimore County affirming a decision by the Baltimore County Board of Appeals (CBA) in favor of appellee Sycamore Realty Co., Inc. (Sycamore). In 1993, Sycamore sought permission to construct 198 townhouse units on a 24–acre site in Baltimore County. The plan did not comply with the density requirements of the property's then-existing zoning classification. Nonetheless, the County Review Group (CRG) approved the plan. Sycamore's development plan was opposed by the Relay Improvement Association (Relay) (a neighborhood association), the People's Counsel for Baltimore County, and several neighboring residents—all of whom are parties to the instant appeal. The CBA approved the plan, and the circuit court affirmed. Both the CBA and the circuit court relied on the theory of zoning estoppel.

Appellants present four issues for our consideration. We renumber those issues, and restate items three and four as follows:

I. Maryland should not adopt the doctrine of zoning estoppel, or should exercise extreme caution.

II. A County Review Group proceeding for review of development is not the proper forum to consider zoning estoppel, nor is the County Board of Appeals.

III. The CBA and the circuit court erred, as a matter of law, in setting forth the elements of zoning estoppel.

IV. The CBA and the circuit court erred in applying the doctrine of zoning estoppel to the facts of this case.

## FACTS

Hilltop Place is a 24.37–acre parcel of land located in southwest Baltimore County. The land is adjacent to the Relay neighborhood, an older, historic community that co-alesced around a railroad facility dating from the mid-nine-teenth century. The community includes both newer sections and older Victorian homes. According to an evaluation per-formed by County planning officials, there is a shortage of park land and recreational sites in the area. Hilltop Place is possibly the last undeveloped parcel of land near Relay that might be used for such purposes. The property is currently owned by appellee Sycamore Realty Co., Inc. When Syca-more first acquired Hilltop Place in 1974, the land was zoned for residential use. The majority of the site (18.21 acres) was zoned at a density of 10.5 residential units per acre (DR 10.5). The remaining 6.16 acres was zoned at a density of 5.5 units per acre (DR 5.5).

In the process of preparing the County's 1990 master plan, the Office of Planning and Zoning reviewed the zoning classifi-cations for Hilltop Place. William Hughey, a community planner, concluded that the property was a "zoning anomaly," and that the DR 10.5 zoning was inconsistent with the density in nearby residential neighborhoods, which ranged from 3.5 to 5.5 units per acre. Hughey discussed the matter with a County Council member whose district included Hilltop Place. Under a February 1990 amendment to the master plan, the Council designated the property as a potential park and

recreation site. Nonetheless, no change was made to the zoning. An appraisal of the site, completed at the County's request in June 1990, noted that the "highest and best use" of the parcel would be development in accord with the existing zoning.

On December 4, 1990, Sycamore filed a plan for the development of Hilltop Place. The plan took advantage of the DR 10.5 zoning and provided for construction of a 220–unit townhouse complex. While reviewing Sycamore's proposed development, planning officials noticed that it conflicted with the master plan. The matter was referred to the Department of Recreation and Parks, and the Department recommended that the County acquire the property.

In January of 1991, the Division of Real Estate in the County's Office of Law was asked to begin negotiations with Sycamore. On March 22, 1991, the County offered Sycamore $560,000, the amount identified by the County's appraiser as the fair market value of the property. Sycamore rejected that offer and asserted that the County's appraisal was flawed.[1] At various points in time, Sycamore asserted that the property was worth at least three to four million dollars, or as much as eight million dollars.

As part of the acquisition effort, the County Council placed the property under public reservation on July 1, 1991. Section 26–66 of the Baltimore County Code provides, in part, that property may be reserved for public use for a period not to exceed eighteen months. Baltimore County Code (B.C.C.) § 26–66(b) & (c) (1988). During the reservation period, "no building or other structure shall be erected on the land so reserved," and the property is exempt from all county and

---

1. Sycamore noted that the appraisal was based on raw undeveloped land without CRG approval, and that the site was evaluated on a per-acre basis rather than a per-townhouse basis. The value determined by the appraiser was based, in part, on the market value of comparable property. In this case, the comparables used by the appraiser were zoned DR 5.5, rather than DR 10.5.

local taxes and other public assessments. B.C.C. § 26–66(e) & (f).

The code requires that the County acquire the property or initiate condemnation proceedings during the reservation period. In the event that the County fails to do so, the planning board "*shall* record" a release of the reservation in the County land records within fifteen days after the reservation period ends. B.C.C. § 26–66(g) (emphasis added). When a property is released without either acquisition or condemnation, the County is liable for any actual damages sustained by the property owner as a result of the reservation. B.C.C. § 26–66(h).

In the present case, the County made only a token effort to acquire Hilltop Place during the reservation period. No formal offers were extended, and the County did not initiate condemnation proceedings. In November of 1991, the County informally suggested a partial acquisition, but Sycamore did not respond. Despite the fact that the reservation period ended on September 14, 1992, the County did not release the property until November 19, 1992—nearly two months after it was required to do so.

While County officials in the Office of Law and the Department of Recreation were attempting to acquire Hilltop Place, the wheels of County government were slowly turning elsewhere. In August of 1991, the County began preparation of a comprehensive rezoning map. At that time, both planning officials and Relay recommended that Hilltop Place be downzoned to DR 5.5. On October 15, 1992, the County Council adopted the comprehensive rezoning. The new zoning classification for Hilltop Place took effect in December of 1992—less than one month after the property was released from reservation.[2] Under the DR 5.5 zoning, only 132 townhouse units could be constructed on the site.

---

2. The precise date is unclear from the record. The CBA's opinion states, at page two, that the downzoning became effective on December 15, 1992. At page eight, however, the CBA states that Hilltop Place "was released from its reservation on November 19, 1992, twelve days

Despite the downzoning of Hilltop Place, Sycamore persisted in efforts to gain approval for its original proposal. Following a public meeting on July 8, 1993, the County Review Group (CRG)[3] approved Sycamore's plan for a 198–unit townhouse development. The number of units was reduced from 220 to 198 because of newly-enacted forest conservation restrictions. *See* MD.CODE ANN., NAT. RES. § 5–1601 *et seq.* (Supp.1994). In approving the plan, the CRG relied on a letter from Arnold Jablon, Director of Zoning Administration, to appellant Louisa Vanderbeek, a neighboring resident. The letter stated, in part:

It is obvious that the change in zoning . . . in concert with the county's decision that it did not have the money to purchase the property, makes the county vulnerable to extensive damages.

The county believes that if the reservation prevents the property owner from recording a plat, the length of time to do so is extended by the period of time that the reservation was in place.

Clearly, the law does not permit the utilization of Section 26–66, BCC, by the county to stay potential development in order that the zoning can be decreased without the need to buy [the property].

---

before the downzoning became effective." By that measure, the new zoning took effect on December 1, 1992. At page nine, the CBA discusses a letter from counsel for Relay to the County's Director of Zoning Administration. The CBA notes that, according to the letter, the new zoning became effective on December 10, 1992.

**3.** The development plan in the present case was approved under an earlier version of Baltimore County's development review and approval process. Previously, the Baltimore County Code (B.C.C.) provided that the CRG may take "final action" on a plan, that the Code defined as "the approval of a plan as submitted, the approval of a plan as amended, or the disapproval of a plan . . ." *Art Wood Enterprises v. Wiseburg Community Ass'n,* 88 Md.App. 723, 728–29, 596 A.2d 712 (1991) (quoting former B.C.C. §§ 26–206(b)(1) and 26–168). Those provisions were amended in 1992, and the CRG was relegated to an advisory role. The authority to approve a plan is now vested in a hearing officer, who must hold a "public quasi-judicial hearing." B.C.C. § 26–206(a) and (b).

Appellants argued, to no avail, that Sycamore had no vested rights, and that the CRG was required to apply the current DR 5.5 zoning. Appellants thereafter noted an appeal from the CRG's decision to the County Board of Appeals (CBA). Sycamore filed a cross-appeal, in which it argued that its right to proceed with the development was not restricted by the time limitations stated in Jablon's letter. The CBA conducted two days of evidentiary hearings in August and November of 1993.

The witnesses offered by Sycamore included Frederick Chadsey, IV, an expert in site planning and engineering, who supervised the preparation of Sycamore's development plan. Based on his experience with numerous projects in Baltimore County, Chadsey estimated that it takes three months or less to take a typical project from filing through CRG approval. With regard to the proposed Hilltop Place development, Chadsey estimated that approximately twelve months would have been required to take the project "from the original submittal of the plan to the time of construction." Chadsey also stated that Sycamore directed him to cease working on the plans for development of Hilltop Place in April 1991, and that he did not resume work until May of 1992. In his words, Sycamore "didn't want us to spend money on it if the county was going to purchase it."

Shirley Murphy, head of the Real Estate Division in the County's Office of Law, testified that her office began working on the proposed acquisition of Hilltop Place in early or late 1989. Murphy acknowledged that the County made no further offers after the County's initial offer was rejected. On December 11, 1991, Murphy received a memorandum directing her to put the project on hold. The memo stated: "Shirley, do not pursue this matter unless you hear from me. Holding pattern for now." According to Murphy, she could not remember if she was aware, at that time, that the property was going to be downzoned during the comprehensive rezoning process.

Wayne Harman, the County's Director of Recreation and Parks since January 1991, testified that the County made no additional offers because "our fiscal world was beginning to crumble." During the 1991 legislative session, the County lost six million dollars in state funds scheduled for allocation through Program Open Space. As Harman explained, the Program Open Space money was "the kingpin, the linchpin, if you will" of the County's potential for the acquisition of new recreational sites. Despite the fact that the County's financial situation "was changing almost daily," Harman testified that the County had sufficient funds available to purchase Hilltop Place at a price "considerably" higher than $560,000. When asked why the County did not remove the reservation earlier, Harman explained:

Our position was that for the price we were willing pursuers. We have been in negotiations in the past where offers had been rejected, and two weeks later offers were accepted. So it would have been foolish for us to have forfeited the—what little opportunity we would have had should there have been a reconsideration.

John Markley, the County's supervising capital budget analyst, testified that $110,000 was allocated toward the acquisition of Hilltop Place in the County's 1991 capital budget. Most of that amount ($100,000) was slated to come from Project Open Space Funds. The 1991 budget also indicated that $406,000 would be allocated toward the "Relay Community Park" during 1992.

According to Markley, the County received substantially less state money through Project Open Space in 1992. The County's 1992 capital budget stated that the "total estimated cost" of Relay Community Park was $816,000. Markley testified that $776,000 of that total was budgeted for site acquisition and right-of-way, and that $731,000 of the necessary funds were expected to come from Project Open Space. Nonetheless, the County's 1992 budget allocated no funds toward the acquisition of Hilltop Place. Instead, the 1992 budget indicated that $406,000 would be allocated during 1993, and that no

additional funds would be allocated during fiscal years 1994 through 1997.

The 1992 budget also stated that the "balance to complete" the project was $300,000. The budget did not indicate when those funds would be allocated, nor did it identify the source of those funds. Markley and Harman both testified that the County could, if necessary, transfer funds from other projects. Because all efforts at acquisition ended with the release of the property in November of 1992, the 1993 budget did not allocate funds toward the acquisition and development of the park.

The witnesses offered by appellants included Ronald Shaeffer, a superintendent working with land acquisition in the Department of Recreation and Parks. Shaeffer testified that he consulted with the County Attorney regarding potential damages in the event that the County reserved Hilltop Place but did not acquire the property. He also testified that his department did. not rule out the acquisition of the property until June or July of 1992, when only a few months remained on the reservation period.

On February 16, 1993, the CBA issued a ten-page written opinion. After reviewing the testimony presented at the hearing, the CBA found as follows:

The testimony and evidence shows that when the County placed the property in reservation on July 1, 1991, it knew the property was slated to be downzoned to DR 5.5.... When the County requested the reservation, it knew it was going to request that the property be downzoned during the next comprehensive rezoning. The testimony of Wayne Harman indicates that he knew almost immediately after becoming Director of Recreation and Parks that his department was going to have severe budget constraints due to cutbacks in both State and County funding.

By December 31, 1991, when the County put the acquisition on hold, County officials undoubtedly knew the County didn't have the funds to acquire the property even at the appraised price of $560,000, which had already been reject-

ed by Sycamore. Nevertheless, the County failed to release the property for almost a year, until November 19, 1992. Whatever the reasons for the County's stalling the release of the reservation, the result was that the downzoning had taken place and the Developer had insufficient time to begin construction and vest an interest in the pre-existing zoning.

The CBA stated that the County's conduct "bordered upon being arbitrary and capricious," and concluded that the County engaged in "administrative negligence" by failing to release the reservation when it had no reasonable expectation of purchasing the property. The CBA further concluded that there was a causal relationship between the County's conduct and Sycamore's failure to vest its rights in the DR 10.5 zoning:

> If the County had released the reservation in December, 1991, when it was clear that it did not have funds to acquire the property, Sycamore would reasonably have had time to obtain CRG approval and begin construction prior to the downzoning, thus vesting its interest in the property.

With regard to Sycamore's cross-appeal, the CBA concluded (1) that the Jablon letter did not constitute an appealable decision or order, and (2) that the CRG did not adopt the eighteen-month time limitation suggested in the Jablon letter. Instead, the CRG's decision stated that approval would expire on July 8, 1996, three years from the date of the decision. Consequently, the CBA concluded that Sycamore's cross-appeal was moot. Sycamore's cross-appeal is not at issue here.

The circuit court affirmed the CBA's decision, and appellants noted the present appeal.

## LEGAL ANALYSIS

As a general rule, judicial review of an administrative decision is narrow, and the same standard applies in both this court and the circuit court. On appeal, we must determine whether the CBA's decision is "in accordance with the law or whether it is arbitrary, illegal, and capricious." *Moseman v. County Council,* 99 Md.App. 258, 262, 636 A.2d 499, *cert. denied,* 335 Md. 229, 643 A.2d 383 (1994). A reviewing

court may not overturn an agency's factual findings or its application of law to facts if the agency's decision is supported by substantial evidence. · *Mortimer v. Howard Research & Dev. Corp.*, 83 Md.App. 432, 441, 575 A.2d 750, *cert. denied,* 321 Md. 164, 582 A.2d 499 (1990). Substantial evidence means more than a "scintilla of evidence," such that a reasonable person could come to more than one conclusion. *Moseman,* 99 Md.App. at 262–63, 636 A.2d 499 (citing *Eger v. Stone,* 253 Md. 533, 542, 253 A.2d 372 (1969)); *Montgomery County v. Greater Colesville Citizens' Ass'n,* 70 Md.App. 374, 382, 521 A.2d 770 (1987). In such a situation, the issue is considered to be "fairly debatable," and the reviewing court may not substitute its judgment for that of the agency. When reviewing issues of law, on the other hand, the standard of review is expansive, and we may reach our own conclusions without deference to the agency's opinion. *Columbia Road Citizens' Ass'n v. Montgomery County,* 98 Md.App. 695, 698, 635 A.2d 30 (1994).

██ As the Court of Appeals explained in *United Steelworkers v. Bethlehem Steel,* 298 Md. 665, 679, 472 A.2d 62 (1984), a reviewing court may not uphold an agency order unless it can be sustained on the agency's factual findings and for the reasons stated by the agency. Accordingly, the CBA's decision here must be supported on the facts that were found by the CBA and stated in the CBA's opinion. Where the agency's factual findings are inadequate, the necessary facts may not be supplied by the parties, and neither we nor the circuit court will scour the record in search of evidence to support the agency's conclusion. *See Ocean Hideaway Condo. Ass'n v. Boardwalk Plaza Venture,* 68 Md.App. 650, 661–62, 515 A.2d 485 (1986).

I

██ Under Maryland law, a landowner whose property is downzoned has no vested right in the prior zoning classification unless the landowner, relying on a valid permit, makes a substantial beginning in actual construction. *Prince George's County v. Sunrise Development,* 330 Md. 297, 307–13, 623

A.2d 1296 (1993); *Board of County Comm'rs v. Pritchard*, 312 Md. 522, 540 A.2d 1139 (1988); *O'Donnell v. Bassler*, 289 Md. 501, 425 A.2d 1003 (1981); *Mayor of Baltimore v. Crane*, 277 Md. 198, 352 A.2d 786 (1976); *Steuart Petroleum v. Board of County Comm'rs*, 276 Md. 435, 347 A.2d 854 (1975); *County Council v. District Land Corp.*, 274 Md. 691, 337 A.2d 712 (1975). *See also Offen v. County Council for Prince George's County*, 96 Md.App. 526, 625 A.2d 424 (1993), *rev'd*, 334 Md. 499, 639 A.2d 1070 (1994). The courts of other states have noted, however, that the strict application of the vested rights rule may sometimes be unreasonable and unjust. In *Offen*, 96 Md.App. at 531–32, 625 A.2d 424, a landowner's attempt to develop his property was stymied by the County's arbitrary and deliberate refusal to issue an essential sewer permit, despite a court order directing the County to do so. We held that "especially egregious actions of public officials in stalling the issuance of permits in order to eliminate development by downzoning may create a zoning estoppel as to particular properties." *Id.* at 577, 625 A.2d 424. As Judge Cathell explained:

In arriving at our resolution, we are particularly aware that Maryland has adopted the strict test as to vesting, *i.e.*, actual substantial construction. As we perceive that standard, it appears to be sufficiently rigid to protect the planning process generally. That rigidity, as we have seen from the cases, can impose heavy burdens on property owners who are unable to progress to actual construction by the date of the downzoning even *under a normal application of the zoning process*. We perceive that extra burdens, such as those alleged in the case at bar, imposed on a property specific basis, are discriminatory; when imposed by officials to take further advantage of the already strict vesting rule, they may be arbitrary and capricious.

*Id.* at 573–74, 625 A.2d 424.

The Court of Appeals reversed our decision for reasons of subject matter jurisdiction rather than substance. The issue of zoning estoppel had not been raised or decided below, and the Court held that we were barred from raising the issue

*nostra sponte. Offen,* 334 Md. at 508–10, 639 A.2d 1070. The Court also concluded that the issue could not be raised in a direct challenge to a county's comprehensive rezoning efforts. The Court said:

> Aside from the practical difficulties of applying a doctrine which has been neither briefed, argued, nor adopted in this jurisdiction, the trial court on remand would be instructed to apply a doctrine that is beyond the proper scope of review of an administrative action. The instant case remains one of narrow scope; this action simply challenges the validity of the District Council's adoption of the SMA. In contrast, the crux of the zoning estoppel theory as explained by the Court of Special Appeals rests in a challenge to collateral proceedings ... that allegedly frustrated Offen's ability to obtain a building permit and thereby vest his rights in the commercial zoning of his property. These issues may be valid, and they may perhaps be raised and considered in a different type of proceeding, but they are not properly raised here.

*Id.* at 510–11, 639 A.2d 1070.

The case before us does not suffer from those procedural difficulties. Sycamore does not contest the validity of the comprehensive rezoning. Rather, it asserts that the application of the new zoning to Hilltop Place is barred by the doctrine of zoning estoppel. The issue was both raised and decided during collateral proceedings; specifically, during administrative review of Sycamore's proposed development plan. The issue of zoning estoppel was briefed and argued by the parties, and was carefully considered in both the County Board of Appeals and the circuit court. Once again, we hold that the doctrine of zoning estoppel is applicable in Maryland.

Because it is clear that appellants, the trial court, and the CBA have misconstrued our decision in *Offen,* we shall take this opportunity to clarify what we mean by "zoning estoppel." In part II, infra, we explain that the issue of zoning estoppel is a legal defense rather than an equitable remedy, and may be adjudicated during administrative proceedings. In part III,

we discuss the elements of zoning estoppel, and explain the relationship between zoning estoppel and the vested rights rule. In part IV, we apply the doctrine of zoning estoppel to the facts of this dispute, and hold that the CBA erred. Both the CBA and the circuit court incorrectly stated the pertinent legal principles. Moreover, the CBA's conclusion that a zoning estoppel existed is not supported by substantial evidence.

## II

As a threshold matter, appellants contend that neither the County Review Group nor the County Board of Appeals had lawful authority to adjudicate the issue of zoning estoppel. Appellants advance two distinct arguments in support of that premise. First, they contend that the issue of zoning estoppel involves an equitable remedy, which may be granted only by a court of equity. Second, they contend that the CRG and the CBA are both "creatures of statute" with no authority other than those powers expressly granted by the County charter and code. *See, e.g.,* 4 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING § 22.02, at 6 (3d ed. 1986) (explaining that a zoning board of adjustment has "limited powers," and that the board's jurisdiction "is described and limited by the zoning enabling acts and local ordinances and charters").

Appellants rely, in part, on the following language contained in the Baltimore County Code:

In addition to compliance with these development regulations, all development *shall comply* with all other applicable laws, rules, or regulations of the county.

B.C.C. § 26–180 (emphasis added). Other sections of the County's development regulations contain similar language. *See* B.C.C. § 26–166(a) ("All development of land must conform to the master plan including adopted community plans and these regulations."); B.C.C. § 26–206(b) (stating that a hearing officer "shall grant approval of a development plan that complies with these development regulations" and other applicable policies and regulations). In *Miller v. Forty West Builders,* 62 Md.App. 320, 333, 489 A.2d 76 (1985), we noted

that approval of a development plan "will necessarily entail review of and compliance with the applicable zoning regulations." Thus, "where a preliminary plat indicates on its face that it is violative of zoning ordinances," an administrative decision to deny approval of the plat will be sustained. *Id.* at 334, 489 A.2d 76 (quoting 1 YOKLEY, ZONING LAW AND PRACTICE § 17–10 (1979)). *See also* 4 ANDERSON § 23–21, 25.21 at 333 ("it seems clear that plats should not be approved which violate existing zoning regulations").

At the outset, we reject appellants' assertion that the present case is controlled by *Offen,* 334 Md. at 510, 639 A.2d 1070, wherein the Court of Appeals stated that the issue of zoning estoppel "is beyond the proper scope of review of an administrative action." The administrative decision at issue in *Offen* was the district council's decision to adopt a comprehensive rezoning plan. The Court of Appeals recognized that "appellate review of comprehensive rezoning is limited in scope," *id.* at 507, 639 A.2d 1070, and concluded that the zoning estoppel issue could not be used to challenge the validity of the rezoning amendment. *Id.* at 511, 639 A.2d 1070. As we noted above, the Court concluded that the issue "may perhaps be raised" in a collateral proceeding. *Id.* That observation is consistent with the Court's earlier decision in *Crane,* 277 Md. at 210, 352 A.2d 786, wherein the Court held that a landowner had acquired a vested *contractual* right to develop a particular site, and that the City was estopped from applying a comprehensive rezoning ordinance to the property at issue. In *Crane,* as in the case at hand, the estoppel issue was raised in collateral proceedings. *See Crane,* 277 Md. at 204, 352 A.2d 786 (explaining that the planning commission disapproved preliminary development plans, and that the Cranes filed suit seeking a writ of mandamus and damages).

■ The procedural challenge posed by appellants in the present case suffers from a fundamental error: appellants have misconstrued the nature of zoning estoppel. Historically, the doctrine of equitable estoppel has been treated as a *legal defense* based upon equitable principles, rather than a form of

equitable relief.[4] Accordingly, the Court of Appeals has consistently concluded that the existence of an equitable estoppel is a question of fact, to be determined by the trier of fact. *See Travelers Indemnity Co. v. Nationwide Construction Corp.*, 244 Md. 401, 414–15, 224 A.2d 285 (1966) ("We have repeatedly stated that whether or not an equitable estoppel exists is a question of fact to be determined in each case."). *See also Eastern Shore Warehousing, Inc. v. Wallis*, 87 Md.App. 141, 149, 589 A.2d 497 *cert. denied*, 324 Md. 325, 597 A.2d 422 (1991) (holding that the evidence was not legally sufficient to submit the issue of equitable estoppel to a jury); *Zimmerman v. Summers*, 24 Md.App. 100, 118–23, 330 A.2d 722 (1975). *Compare Mattingly v. Mattingly*, 92 Md.App. 248, 250, 607 A.2d 575 (1992) ("Because the issues presented and remedies requested here are purely equitable," the trial court erred in submitting the case to a jury.). The existence of a zoning estoppel is likewise a question of fact rather than a form of equitable relief. *See Offen*, 96 Md.App. at 577–78, 625 A.2d 424. The essence of equity jurisprudence is the exercise of judicial discretion, culminating in a writ of mandamus or other injunctive relief. *See McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, 223, 37 A.2d 305 (1944); *Solvuca v. Ryan & Reilly Co.*, 131 Md. 265, 282, 101 A. 710 (1917). By contrast, the adjudication of a zoning estoppel issue involves a fairly straightforward application of law to facts.

Despite the fact that "administrative boards and officials are arms and instrumentalities of the Legislature," *Dal Maso v. County Comm'rs.*, 182 Md. 200, 205–06, 34 A.2d 464 (1943), it is firmly established that agencies may adjudicate legal dis-

---

4. In *Knill v. Knill*, 306 Md. 527, 510 A.2d 546 (1986), the Court of Appeals approved the following definition of equitable estoppel:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he [or she] is absolutely precluded both at law and in equity from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his [or her] position for the worse....

*Id.* at 534, 510 A.2d 546 (quoting Pomeroy, Equity Jurisprudence § 804 (5th ed. 1941)).

putes.[5] *See, e.g.,* 4 ANDERSON, § 22.02, at 7 ("The powers of a board of adjustment are adjudicatory."). Under Article 4 of the Maryland constitution, the judicial power of this State is vested in certain enumerated courts, and "such intermediate courts of appeal as the General Assembly may create by law...." CONST. OF MD., art. IV, § 1. Accordingly, the Court of Appeals has concluded that the Legislature may not vest administrative bodies "with any judicial authority." *Dal Maso,* 182 Md. at 206, 34 A.2d 464. Nonetheless, an agency may make factual determinations. It may also apply the pertinent law to those facts. The agency's exercise of those functions "does not alone vest [the agency] with judicial power in the constitutional sense." *Attorney General v. Johnson,* 282 Md. 274, 284, 385 A.2d 57 (1978). To conclude otherwise would be to embrace "the erroneous notion that all adjudication is judicial." *Id.* (quoting *Mulhearn v. Federal Shipbuilding & Dry Dock Co.,* 2 N.J. 356, 66 A.2d 726, 730 (1949)). In *Ocean City Board of Supervisors v. Gisriel,* 102 Md.App. 136, 148, 648 A.2d 1091 (1994) *cert. granted,* 337 Md. 641, 655 A.2d 400 (1995), we recently noted that a "quasi-judicial" adjudication by an agency represents a discharge of the agency's executive duties, rather than an exercise of judicial power. As with other adjudications by an administrative body, both the County Review Group and the County Board of Appeals may adjudicate the zoning estoppel issue, but neither body has any independent power to enforce the result.

 It is indisputably the case that the County Board of Appeals had lawful authority to entertain an appeal from the

---

5. In the context of zoning, we have recognized a limited exception to this rule. *See Landover Books, Inc. v. Prince George's County,* 81 Md.App. 54, 67, 566 A.2d 792 (1989) ("since a board of zoning appeals is not a judicial body, it may not rule on the constitutionality of the ordinance under which it is authorized to act"). *See also Anne Arundel County v. 2020C West St.,* 104 Md.App. 320, 332–33, 656 A.2d 341 (1995) ("[w]hether the regulatory scheme is constitutional is an issue properly decided by the courts" rather than the County Board of Appeals). Because the zoning estoppel issue does not involve the constitutional validity of the County's zoning scheme, the exception we recognized in *Landover Books* is not applicable here.

CRG's approval of Sycamore's development plans. *See* MD. ANN.CODE art. 25A, § 5(U) (1994 Repl.Vol.) (permitting counties to establish a County Board of Appeals with jurisdiction over matters relating to zoning, including the issuance or denial of any permit "or other form of permission"); Baltimore County Charter § 602(b) (enumerating the powers of the Baltimore County Board of Appeals, which include "Appeals From Orders Relating to Zoning"). As the Court of Appeals noted in *O'Donnell,* 289 Md. at 508, 425 A.2d 1003, "[a]n appellate court must apply the law in effect at the time a case is decided, *provided that its application does not affect intervening vested rights.*" (Emphasis added). The same standard applies to proceedings in the County Board of Appeals. *See Sunrise Dev.,* 330 Md. at 299–300, 623 A.2d 1296.[6]

Notwithstanding the language of the Baltimore County Code, we see no reason why that principle should not be applied to the CRG's final approval of the plan at issue here. Indeed, the County code requires that the CRG review the development in accord with all "applicable" county law. Where vested rights or a zoning estoppel has been found, the prior zoning regulations are, in effect, the "applicable" county law, if only with regard to the subject property. As we explain below, our narrow version of the zoning estoppel doctrine may best be understood as a "bad faith" exception to the vested rights rule. Because the CRG and the CBA had proper authority to consider the vested rights rule, it follows that they could also consider the issue of zoning estoppel.

On a related point, appellants contend that the authority of the CBA was limited by the damage provision contained in the County code, and that an action for actual damages was Sycamore's sole remedy for any damages "sustained . . . by reason of the public reservation." B.C.C. § 26–66(h). We

---

6. In *Sunrise Dev.,* 330 Md. at 299–300, 623 A.2d 1296, the Prince George's County Board of Administrative Appeals concluded that downzoning was permitted because the developer's rights had not vested. Both this Court and the circuit court reached the opposite conclusion. The Court of Appeals reversed our decision and reinstated the order of the administrative board.

disagree. In the absence of express language to the contrary, a statutory damage remedy does not preclude other common-law claims for relief, including an assertion that a zoning estoppel existed.

## III

We think it essential to explain that we use the term "zoning estoppel" more narrowly than the courts of most states. Under the "black-letter" definition of "zoning estoppel," a local government will be estopped from asserting its zoning powers over a subject property when the property owner, (1) relying in good faith, (2) on some act or omission of the government, (3) has made such a substantial change in position or incurred such extensive expenses that it would be manifestly unjust to permit the government to destroy the rights of the property owner by subsequent regulation. David G. Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes*, 1971 URBAN L.ANN. 63, 66. Heeter's articulation of the zoning estoppel principle has been widely endorsed by courts and commentators alike. *See* ARDEN H. & DAREN H. RATHKOPF, 4 THE LAW OF ZONING AND PLANNING § 45.04, at 45–44 (1991); PATRICK J. ROHAN, 7 ZONING AND LAND USE CONTROLS § 52.08[4], at 52–88 (1995); Robert M. Rhodes & Cathy M. Sellers, *Vested Rights: Establishing Predictability in a Changing Regulatory System*, 20 STETSON L.REV. 475, 478 (1991); Lynn Ackerman, *Searching for a Standard for Regulatory Takings Based on Investment–Backed Expectations: A Survey of State Court Decisions in the Vested Rights and Zoning Estoppel Areas*, 36 EMORY L.J. 1219, 1261–64 (1987); Richard B. Cunningham & David H. Kremer, *Vested Rights, Estoppel, and the Land Development Process*, 29 HASTINGS L.J. 625, 649 (1978). *See also Offen*, 334 Md. at 505 n. 4, 639 A.2d 1070 (explaining the doctrine of zoning estoppel by paraphrasing Heeter's definition). Although Maryland has never endorsed Heeter's broad, black-letter version of zoning estoppel, the Court of Appeals has applied a similar principle in cases involving equitable estoppel against a government

entity. *See Inlet Associates v. Assateague House,* 313 Md. 413, 434–36, 545 A.2d 1296 (1988) (explaining that municipal estoppel may be found where a party has "changed his [or her] position for the worse" in good faith reliance on actions undertaken by government officials, provided that those actions are within the scope of their lawful authority). *See also Permanent Financial Corp. v. Montgomery Cty.,* 308 Md. 239, 518 A.2d 123 (1986); *City of Hagerstown v. Long Meadow Shopping Center,* 264 Md. 481, 287 A.2d 242 (1972); *Town of Berwyn Heights v. Rogers,* 228 Md. 271, 179 A.2d 712 (1962); *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743 (1933); 3 J. POMEROY, EQUITY JURISPRUDENCE § 804 (5th ed. 1941) (discussing the general principle of equitable estoppel).

On rare occasions, the Court of Appeals has applied the doctrine of equitable estoppel in the context of zoning matters. In *Crane,* 277 Md. at 207, 352 A.2d 786, for example, the Court of Appeals concluded that the city was "estopped from attempting to enforce" a 1971 zoning ordinance because of the Cranes' "substantial change in position." We think it essential to note, however, that the Court's decision was based on principles of contract rather than property.[7] *See Crane,* 277 Md. at 210, 352 A.2d 786 (explaining that "[t]his case should not be confused with those in which a property owner contends that he has a vested right in an existing zoning classification").

In *Permanent Financial,* 308 Md. at 239, 518 A.2d 123, Montgomery County issued a permit for construction of a building that violated certain height restrictions. After four floors had been built to a height of forty-three feet, the County obtained a stop work order. The Court of Appeals

---

7. As the Court explained, the Cranes conveyed a 4.6–acre parcel to the City in exchange for the right to construct 180 units on an additional 6.5 acre tract. Thereafter, the City enacted a comprehensive rezoning which was inconsistent with the agreement, and the City attempted to enforce the ordinance against the Cranes. *Crane,* 277 Md. at 202–04, 352 A.2d 786. The Court of Appeals concluded that "[t]he Cranes' rights were contractual *and became vested by their conveyance* as solidly as if they had entered into a contract with the City to sell the 4.6–acre parcel for $70,000.". *Id.* at 210, 352 A.2d 786 (emphasis added).

held that the County was estopped from requiring the developer to remove the fourth floor. The Court stressed, however, that the decision to issue the permit was consistent with the County's long-standing practice, and was based on a reasonable, good-faith interpretation of an ambiguous provision in the County's building code. *Id.* at 250–52, 518 A.2d 123. Although the Court framed the issue as one of estoppel, the facts are consistent, in most respects, with the vested rights rule. In effect, the Court merely recognized a narrow exception to the general requirement that a developer's rights may not be vested in the absence of a valid permit.

Notwithstanding the decisions in *Crane* or *Permanent Financial,* the Court of Appeals has neither endorsed nor rejected the black-letter version of zoning estoppel. *Offen,* 334 Md. at 505–06 n. 4, 639 A.2d 1070. As *Permanent Financial* suggests, the vested rights rule and the doctrine of zoning estoppel are frequently confused, and "courts seem to reach the same results when applying these defenses to identical fact situations." *See* Heeter, *supra,* 1971 URBAN L.ANN. at 64–66. *See also* 4 RATHKOPF & RATHKOPF, *supra,* § 45.04, at 45–44; 7 ROHAN, *supra,* § 52.08[4], at 52–90; *Offen,* 96 Md.App. at 569 n. 23, 625 A.2d 424.[8] Heeter explained the difference as follows:

> The defense of estoppel is derived from equity, but the defense of vested rights reflects principles of common and constitutional law. Similarly, their elements are different. Estoppel focuses upon whether it would be inequitable to

---

8. One commentator has noted:

 Judicial reliance on the vested rights doctrine ... is unfortunately characterized by inconsistent application and confusing rationales. In fact, the doctrine is not a single rule but instead a variety of judicial and legislative policies related only by the ease with which use of the term "vested" forecloses the searching analysis necessary to a proper dissection of the problem. Thus, the rationale applied by a particular court in such a situation might be based on rigid concepts of private property rights, theories of equitable estoppel, generalized prohibitions against retroactive application of new laws, or vague concepts of fairness.

 Cunningham & Kremer, *supra,* 29 HASTINGS L.J. at 626.

allow the government to repudiate its prior conduct; vested rights upon whether the owner acquired real property rights which cannot be taken away by government regulation.

Heeter, *supra,* 1971 URBAN L.ANN. at 64–66. Another commentator has suggested that the doctrine of zoning estoppel "is really a more flexible test that emphasizes principles of equity, rather than specific points in time that trigger vesting." Ackerman, *supra,* 36 EMORY L.J. at 1256.

The nature and extent of the confusion may be illustrated by juxtaposing Heeter's definition of zoning estoppel against the Maryland rule of vested rights. In *Sunrise Dev.,* 330 Md. at 297, 623 A.2d 1296, the Court of Appeals explained that

[g]enerally, in order to obtain a vested right in an existing zoning use . . . an owner must initially obtain a valid permit. Additionally, *in reliance* upon the valid permit, the owner must make *a substantial beginning in construction* and in committing the land to the permitted use before the change in zoning has occurred.

*Id.* at 307, 623 A.2d 1296 (quoting *O'Donnell v. Bassler,* 289 Md. 501, 508, 425 A.2d 1003 (1981)) (emphasis added). The parallels between zoning estoppel, municipal estoppel and the vested rights rule are obvious: each requires that a party incur a substantial change in circumstances, based on good faith reliance on some government act or omission. In Maryland, our strict version of the vested rights rule severely narrows those requirements. The rule provides, in effect, that a landowner may rely on nothing other than a properly-issued permit, and that a substantial change in circumstances will not be found unless the landowner begins actual, above-ground construction.

In other jurisdictions, the contrast between vested rights and Heeter's definition of zoning estoppel is less distinct. Many states, for example, do not require actual construction. Thus, a landowner who incurs "substantial" or "considerable" expenses in good-faith reliance on certain government actions acquires a vested right to existing zoning and may complete

the project notwithstanding subsequent changes in the zoning regulations. *See, e.g., Town of Paradise Valley v. Gulf Leisure Corp.,* 27 Ariz.App. 600, 557 P.2d 532, 540 (1976) (reliance on valid permit); *Pioneer Trust and Savings Bank v. County of Cook,* 71 Ill.2d 510, 17 Ill.Dec. 831, 836–37, 377 N.E.2d 21, 26–27 (1978) (reliance on *probability* that a permit will be issued); *Life of the Land, Inc. v. City Council of Honolulu,* 60 Haw. 446, 592 P.2d 26, 35–36 (1979) (reliance on official "assurances" that project complied with zoning regulations"). *Compare Washington Suburban Sanitary Comm'n v. TKU Assocs.,* 281 Md. 1, 23, 376 A.2d 505 (1977) ("merely to allege large expenditures without actual construction on the site cannot vest zoning rights"); *Steuart Petroleum,* 276 Md. at 444, 347 A.2d 854; *Ross v. Montgomery County,* 252 Md. 497, 250 A.2d 635 (1969). In Georgia, a landowner has a vested right to develop his or her property pursuant to a validly-issued permit, "notwithstanding the fact that there has been no substantial expenditure of funds in reliance upon the building permit." *WMM Properties, Inc. v. Cobb County,* 255 Ga. 436, 339 S.E.2d 252, 254 (1986). In other states, a landowner acquires a vested right to proceed under existing zoning regulations when a proper application for a building permit has been filed. *See Smith v. Winhall Planning Comm'n,* 140 Vt. 178, 436 A.2d 760, 761 (1981); *Allenbach v. City of Tukwila,* 101 Wash.2d 193, 676 P.2d 473, 474–75 (1984) (en banc). *Compare County Comm'rs v. Arundel Corp.,* 82 Md.App. 418, 428, 571 A.2d 1270 (1990), *vacated on other grounds,* 323 Md. 504, 594 A.2d 95 (1991) (holding that an application for a building permit does not create vested rights). As a practical matter, there is no bright-line distinction between the vested rights rule and the black-letter definition of zoning estoppel. The two doctrines are merely opposite poles of a single continuum, with a dozen distinct shades of gray between them.

We think it obvious that the broad, black-letter doctrine of zoning estoppel, as articulated by Heeter, is incompatible with Maryland's vested rights rule. We emphasize that the doctrine we adopt here under the rubric "zoning estoppel" is not

based on that broad definition, nor is it based on the doctrine of municipal estoppel articulated in *Permanent Financial,* 308 Md. at 239, 518 A.2d 123, and its predecessors. Instead, we adopt a narrow version of zoning estoppel, with a distinct set of requirements. Unlike the traditional definition of zoning estoppel, the doctrine we embrace here supplements the vested rights rule by recognizing that the strict application of that rule may sometimes be unjust or unreasonable.

As Judge Cathell explained in *Offen,* 96 Md.App. at 573–74, 625 A.2d 424, local government officials have sometimes engaged in conduct intended to take advantage of the strict vesting rule by unreasonably preventing a landowner from progressing to actual construction prior to the date of downzoning. Such conduct may be arbitrary and capricious. When it is, equitable principles demand that the government be estopped from taking advantage of official misconduct. Thus, we concluded in *Offen* that the doctrine of zoning estoppel prevents local officials "from taking particularly egregious actions designed to prevent vesting and then relying on the absence of vesting to thwart the previously permitted plans of the developer." *Offen,* 96 Md.App. at 569 n. 23, 625 A.2d 424. In effect, our narrow version of zoning estoppel operates as an equitable, "bad faith" exception to the vested rights rule. *Compare Permanent Financial,* 308 Md. at 250–52, 518 A.2d 123 (recognizing a limited exception to the rule that rights will not vest without a valid permit). Under the black-letter definition of zoning estoppel, the focus is on the landowner's good faith reliance. Under our limited version of zoning estoppel, the focus is on the government's arbitrary and unreasonable conduct, as well as the causal relationship between the government's conduct and the landowner's inability to proceed to actual construction.

The interplay between the vested rights rule and our doctrine of zoning estoppel may be illustrated by brief discussions of three decisions from other jurisdictions: *Humble Oil & Refining v. Wahner,* 25 Wis.2d 1, 130 N.W.2d 304 (1964); *Marmah, Inc. v. Town of Greenwich,* 176 Conn. 116, 405 A.2d 63 (1978); and *Whitehead Oil Co. v. City of Lincoln,* 234 Neb.

527, 451 N.W.2d 702 (1990). In each of those cases, the reviewing court concluded that the landowner had no vested rights in the prior zoning. Nonetheless, those courts also concluded that the local governments involved had engaged in conduct deliberately calculated to prevent the landowner from proceeding with construction. In light of that misconduct, the local governments in question were estopped from enforcing a change in zoning.

In *Humble Oil,* 25 Wis.2d 1, 130 N.W.2d at 304, the landowner applied for a permit to construct a filling station on the northeast corner of an intersection. The applicable zoning ordinance prohibited the location of filling stations within areas zoned "commercial" unless the plans were approved by the town board of appeals. At the time of Humble's request, there were filling stations on each of the three remaining corners. *Id.* 130 N.W.2d at 305–06. On three separate occasions over the course of the following year, Humble petitioned the board for permission to build the station. Each of those petitions was denied without factual findings or a formal statement of the board's reasons. During the same period, the board granted a permit that allowed one of the existing stations to expand its operations. Humble appealed the board's decision to deny his proposal and petitioned for a writ of mandamus to compel the building inspector to issue a permit. While the case was pending, the town amended its zoning ordinance to completely prohibit filling stations in the commercial district. *Id.* 130 N.W.2d at 306–07.

On appeal, the Supreme Court of Wisconsin held that Humble was clearly entitled to the writ of mandamus. The court's analysis proceeded in three distinct steps. First, the court concluded that the earlier version of the ordinance was invalid because the ordinance prescribed no standards to guide the town board of appeals in determining whether to grant or deny a requested filling station. Accordingly, Humble was entitled to a building permit without the approval of the town board. *Id.* 130 N.W.2d at 309–10. Second, the court concluded that Humble had no vested rights at the time that the ordinance was amended. *Id.* 130 N.W.2d at 310. Despite the

absence of vested rights, the court held that the town was estopped from applying the amended ordinance to Humble. The court observed:

But the fact that Humble did not have any vested rights at the time the new ordinance was adopted does not mean that the town could deny Humble a building permit on the ground that as of March 4, 1963, the new ordinance absolutely barred filling stations in the area. . . .

Equitable considerations bar the town from giving Humble such a fast shuffle at this late stage in the game. While Humble filed its petitions and its station plans and was turned down on each occasion without any notice from the board as to its reasons for denying the permit, the board approved a request for expansion in the facilities of one of the three filling stations already in existence on the other corners of the intersection. . . . [I]t is apparent that the town officials were trying to keep one jump ahead of Humble and were attempting to change the rules after they had been hailed into court for what Humble believed was arbitrary, unreasonable, and capricious action.

*Id.* 130 N.W.2d at 311. Under the circumstances, the court concluded, it would be "manifestly unfair" to apply the amended ordinance to Humble. *Id.*

In *Marmah*, 405 A.2d at 63, a landowner sought permission to construct a post office. Marmah's application for site plan approval was denied by town officials, despite the fact that the proposed use was permitted under then-applicable regulations. In January 1973, Marmah appealed the town's decision. While that appeal was pending, town officials amended the zoning regulations and Marmah's proposed use was prohibited. *Id.* 405 A.2d at 66–67.

Under applicable Connecticut law, a landowner did not have a vested right in existing zoning classifications unless a permit had been issued and the building was "substantially under construction" before the zoning regulations were amended. *Id.* 405 A.2d at 66. Because a permit had not been issued and construction had not begun, the Supreme Court of Connecticut

concluded that Marmah had no vested rights. Nonetheless, the court held that the city could be estopped from applying the amended regulations to Marmah. The court noted that "[t]he specific issue before us is whether, in this case, legislative power was in fact exercised to promote the general welfare, or was instead invoked for the primary purpose of precluding Marmah from using its property to build a post office." *Id.* 405 A.2d at 67. After reviewing the trial court's factual findings, the Connecticut court observed:

> In the light of those findings, combined with the findings of the unfairness of the hearing itself, the trial court could reasonably conclude that this zoning amendment was enacted for the primary purpose of preventing the plaintiff from going forward with its contemplated building project. In such circumstances, it is inequitable to allow the changed building zone regulations to act as a bar. . . .

*Id.* 405 A.2d at 67.

In *Whitehead Oil,* 451 N.W.2d at 702, the landowner applied for a land-use permit that would allow construction of a convenience retail store and a service station. Those uses were permitted under the applicable zoning regulations, and the planning director recommended approval of the application. For a period of more than four months, planning officials and the city council delayed action on Whitehead's permit. At the request of local residents, the property was then rezoned as an "office park," and Whitehead's proposed use was no longer permitted. *Id.* 451 N.W.2d at 703–04. City officials conceded that the delay was "for the purpose of preventing [Whitehead's] use permit from being issued" until action could be taken on the requested change in zoning. *Id.* 451 N.W.2d at 704.

On appeal, the Supreme Court of Nebraska held that Whitehead had not acquired vested rights in the prior zoning. *Id.* 451 N.W.2d at 706. The court likewise concluded that the outcome was not governed by black-letter principles of zoning estoppel because Whitehead's expenditures in preparing to obtain the land-use permit were not sufficiently "substantial."

*Id.* Notwithstanding those conclusions, the court held that the amended zoning regulations did not apply to Whitehead's proposed use:

> All the same, a zoning authority may not use its powers to reward its friends or punish its enemies; thus, *where a zoning authority is guilty of misconduct or bad faith* in its dealings with the applicant for a use permit in accordance with the then existing zoning regulation or arbitrarily and unreasonably adopts a new regulation to frustrate the applicant's plans for development rather than to promote the general welfare, the new regulation may not be applied retroactively.

*Id.* 451 N.W.2d at 706–07 (emphasis added). During a subsequent appeal, the Nebraska court clarified the range of official misconduct sufficient to support a zoning estoppel:

> The fact that the city reacted to the arguably valid concerns of its citizens in the area does not mean that the decision is valid as being based upon concerns for the general welfare. Nor is the city's denial of the existence of any ill will toward Whitehead Oil of any moment. Whatever the motives, a zoning decision which does not promote the general welfare is arbitrary and unreasonable.

*Whitehead Oil Co. v. City of Lincoln (Whitehead Oil II),* 245 Neb. 660, 515 N.W.2d 390, 400 (1994) (citing *Commercial Prop., Inc. v. Peternel,* 418 Pa. 304, 211 A.2d 514 (1965)).

The landowner in *Offen,* 96 Md.App. at 526, 625 A.2d 424, was confronted with an equally egregious pattern of official misconduct. Offen proposed to develop his property in Prince George's County as a commercial medical campus. Certain local officials publicly, but informally, made favorable comments with regard to Offen's proposed use. After undertaking the usual preliminary planning, including work by architectural, legal, engineering, and marketing consultants, Offen applied for an essential sewer permit. His request was denied. *Id.* at 530–31, 625 A.2d 424. Offen filed suit, and the Circuit Court for Prince George's County concluded that the County's decision to deny the permit was "arbitrary and

capricious." *Id.* at 531, 625 A.2d 424. Despite a court order to issue the permit, the County continued to drag its feet. Before the permit was issued, the County completed a comprehensive rezoning, and Offen's property was rezoned for residential use. *Id.* at 532, 625 A.2d 424. We concluded:

> The evidence, if believed by the trier of fact, may well support a finding that the County's *sole purpose* in denying appellant ... any opportunity to commence construction permitted by the existing commercial zoning was to consummate a downzoning that would effectively prohibit the use planned by appellant. This appears especially evident, and may be made virtually undebatable, by the appellee's contemptuous actions in neither appealing nor obeying the trial court's order to issue the sewer permit. The record clearly supports an inference that [the County's] delay in compliance with that order was not a coincidence; *it was a calculation designed to delay appellant* until the use became prohibited.

*Id.* at 577, 625 A.2d 424 (emphasis added). As in *Humble Oil, Marmah, Inc.,* and *Whitehead Oil,* the facts in *Offen* supported the conclusion that local government officials acted in a deliberate attempt to stall the landowner's lawful plans for development until a change in zoning could be enacted.

In reviewing the proceedings here, we perceive that both the CBA and the circuit court have misconstrued our opinion in *Offen* by concluding that "administrative negligence" was sufficient to support a zoning estoppel. In reaching that result, the CBA and the trial court each relied on two decisions by the Court of Appeals of New York, both of which we quoted in *Offen.* *See Amsterdam–Manhattan Assocs. v. Joy,* 42 N.Y.2d 941, 397 N.Y.S.2d 1000, 1001, 366 N.E.2d 1354, 1355 (1977) ("Even in the absence of bad faith, administrative procrastination of this magnitude, be it negligent or willful, without excuse or justification, affords a basis for applying the pre-existing regulations...."); *Faymor Dev. Co. v. Board of Standards and Appeals,* 45 N.Y.2d 560, 410 N.Y.S.2d 798, 800–801, 383 N.E.2d 100, 102–03 (1978) (a municipality may "be estopped from claiming the benefits of its own inaction,

whether intentional or merely negligent"). Notwithstanding the language used by the New York court, we observe that both *Amsterdam–Manhattan* and *Faymor* involved more than mere municipal negligence.

In *Amsterdam–Manhattan*, 397 N.Y.S.2d at 1001, 366 N.E.2d at 1355, the New York Office of Rent Control enacted a 15-month moratorium on applications for "electrical exclusion decrease orders" while the agency prepared and promulgated revised regulations. As in *Whitehead Oil II*, 515 N.W.2d at 400, the New York court concluded that the agency's conduct was both "arbitrary" and "unreasonable." *Id.* at 1000–1001, 366 N.E.2d at 1354–55. In *Faymor*, 410 N.Y.S.2d at 801, 383 N.E.2d at 103, the landowner's efforts to proceed with construction were delayed and ultimately frustrated by violent opposition from area residents, who took to the streets and prevented work crews from entering the construction site. In the face of community opposition, "city officials displayed a willingness to appease the protesters at petitioner's expense." *Id.* At the outset, the building department revoked a previously-issued permit on mere technical grounds. While a change in zoning was pending, "city police officials stood by while a lawless mob prevented petitioner from vesting its rights under the existing law." *Id.* Under the circumstances, it was obvious that the city's failure to act was deliberately calculated. The New York Supreme Court, Appellate Division, explained the matter succinctly: the city, that court observed, had "improperly placed hurdles" in the landowner's path, thereby preventing the landowner from proceeding to actual construction. *Faymor Dev. Co., Inc. v. Board of Standards and Appeals*, 57 A.D.2d 928, 394 N.Y.S.2d 732, 734 (1977), *aff'd*, 45 N.Y.2d 560, 410 N.Y.S.2d 798, 383 N.E.2d 100 (1978).

In concluding that a zoning estoppel could be grounded in negligent government conduct, the CBA and the trial court also relied on Maryland cases involving equitable or municipal estoppel. *See, e.g., Traveler's Indemnity*, 244 Md. at 414, 224 A.2d 285 ("an estoppel may arise even where there is no intent to mislead"); *Inlet Associates*, 313 Md. at 438, 545 A.2d 1296

("None of this is to say that a municipality cannot be estopped where in the course of executing its granted powers it merely does so irregularly or defectively."). Because our narrow version of zoning estoppel is distinct from traditional principles of equitable estoppel, we think those cases are inapposite here. Moreover, the conclusion reached by the CBA and the court is inconsistent with a long line of cases involving the vested rights rule, in which the Court of Appeals has concluded that a landowner may not rely on an erroneously-issued permit.

In *Lipsitz*, 164 Md. at 227, 164 A. 743, the Court explained:
A municipality may be estopped by the act of its officers if done within the scope and in the course of their authority or employment, but estoppel does not arise should the act be in violation of law.... A permit thus issued without the official power to grant does not, under any principle of estoppel, prevent the permit from being unlawful nor from being denounced by the municipality because of its illegality.

In *Long Meadow*, 264 Md. at 481, 287 A.2d 242, the Court stated the point with more vigor:
In issuing a permit officials are discharging a government function, and the city and its citizens cannot be bound or estopped by the unauthorized acts of its officers in pursuance of that function.... even though a substantial amount of work had been done on the property without official interference.

*Id.* at 496, 287 A.2d 242 (quoting 8 McQUILLIN, MUNICIPAL CORPORATIONS § 25.153, at 489 (1965 Rev.Vol.)). Accordingly, the Court has consistently held that a landowner who obtains a permit and begins construction before the expiration of an appeal period does not acquire a vested right to proceed with construction. *See O'Donnell,* 289 Md. at 508, 425 A.2d 1003; *Long Meadow,* 264 Md. at 494–96, 287 A.2d 242; *Berwyn Heights,* 228 Md. at 279–80, 179 A.2d 712; *Lipsitz,* 164 Md. at 227–28, 164 A. 743. *Compare Permanent Financial,* 308 Md. at 250–52, 518 A.2d 123. If the negligent or mistaken decision to issue a building permit cannot create vested rights, then it

follows that a showing of administrative negligence will not suffice to support an assertion of zoning estoppel.

█ Our conclusion in that regard is consistent with the broader public policy goals of the zoning and planning process. As an exercise of the government's police power, zoning laws are generally aimed at the protection of the public's health, safety, and general welfare. *See Schultz v. Pritts*, 291 Md. 1, 19–20, 432 A.2d 1319 (1981); *Levinson v. Montgomery County*, 95 Md.App. 307, 327–28, 620 A.2d 961, *cert. denied*, 331 Md. 197, 627 A.2d 539 (1993). *See also Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387–88, 47 S.Ct. 114, 118–118, 71 L.Ed. 303 (1926). Accordingly, the adoption and enforcement of local zoning ordinances is intended to strike a balance between the public welfare and a landowner's right to use his or her property for any purpose that would otherwise be lawful. *See, e.g., Grant v. Mayor of Baltimore*, 212 Md. 301, 315, 129 A.2d 363 (1957) (noting that the reasonableness of a zoning ordinance depends on the "importance of the public gain in relation to the private loss"); *Lone v. Montgomery Co.*, 85 Md.App. 477, 494–95, 584 A.2d 142 (1991). *See also Bankoff v. Board of Adjustment*, 875 P.2d 1138, 1141–42 (Okla. 1994) (explaining that the vested rights rule attempts to balance both public and private interests). As we observed in *Offen*, 96 Md.App. at 573–74, 625 A.2d 424, Maryland's strict version of the vested rights rule embodies a measured and firmly-entrenched decision to protect the zoning and planning process, by allowing a change in zoning to go forward unless the rule's strict requirements have been met.

█ In harmony with the policies underlying the vested rights rule, we conclude that allegations of negligent delay, standing alone, are not sufficient to support a finding of zoning estoppel.[9] A delay of one sort or another is to be expected

---

9. For similar reasons, we reject the conclusion, stated by the County's Director of Zoning Administration, that Sycamore's opportunity to vest its rights to the DR 10.5 zoning should automatically be extended by the length of time that the property was under reservation. The County, of course, is free to amend the County Code accordingly. Alternately, the

during the process of bringing a development project from filing to actual construction. We do not intend to create a situation in which every downzoning of property becomes the seed of protracted litigation. As we explained in *Offen*, 96 Md.App. at 569, n. 23 & 577, 625 A.2d 424, the doctrine of zoning estoppel may be applied only in those situations in which the conduct of government officials is "especially" or "particularly" egregious. *See also Jones v. First Virginia Mortgage & Real Estate Inv. Trust*, 399 So.2d 1068, 1074 (Fla.Dist.Ct.App.1981) (stating that the situations that will trigger an estoppel in the context of zoning are "tightly circumscribed," lest an "unwise restraint" be placed on the police power of the government). Consequently, we hold that a zoning estoppel may not be found unless (1) the local government acts, or fails to act, in an arbitrary and unreasonable manner, (2) with deliberate intent to delay construction, and (3) the conduct at issue is the primary and proximate cause of the landowner's inability to vest his or her rights before a change in zoning occurs.

With regard to the first two elements, the fact finder must conclude that the act or omissions of government officials were deliberately calculated "to deny a property owner his [or her] right to use this land in a currently lawful manner." *Pokoik v. Silsdorf*, 40 N.Y.2d 769, 390 N.Y.S.2d 49, 51, 358 N.E.2d 874, 876 (1976) (quoting 1 ANDERSON, N.Y. ZONING LAW & PRACTICE, § 6.17, p. 196). The type of conduct that will sustain a finding of zoning estoppel is well-illustrated by the facts of *Offen*, 96 Md.App. at 577, 625 A.2d 424, wherein we concluded that the evidence was sufficient to support the

County Council might have refrained from rezoning property that it knew was under reservation. *See, e.g., Pritchard*, 312 Md. at 524–26, 540 A.2d 1139 (comprehensive rezoning provided grace period, during which certain properties were allowed to retain the prior zoning for a period of two years after the rezoning was enacted). As a matter of common-law jurisprudence, however, we think it unwise to conclude that merely placing the property under reservation automatically created a temporary zoning estoppel. The CBA did not find, and Sycamore has not argued, that the County's original decision to place the property under reservation was undertaken in bad faith.

conclusion that the County acted with the "sole purpose" of preventing Offen from starting construction until the comprehensive rezoning could be enacted. *See also Marmah, Inc.,* 405 A.2d at 67 (explaining that "the trial court could reasonably conclude that this zoning amendment was enacted primarily for the purpose of preventing the plaintiff from going forward with its contemplated building project"); *Whitehead Oil,* 451 N.W.2d at 706–07 (holding that the government could be estopped where it "arbitrarily and unreasonably adopts a new regulation to frustrate the applicant's plans for development rather than to promote the general welfare"); *PMC Realty Trust v. Town of Derry,* 125 N.H. 126, 480 A.2d 51, 54 (1984) (case remanded so that trial court could consider whether town officials acted with bad faith during negotiations and litigation that prevented construction of multiple-family housing); *Medical Services, Inc. v. City of Savage,* 487 N.W.2d 263, 267 (Minn.Ct.App.1992) ("A municipality may not arbitrarily enact an interim moratorium ordinance to delay or prevent a single project."); *Hollywood Beach Hotel Co. v. City of Hollywood,* 329 So.2d 10, 16–17 (Fla.1976) (sole purpose of city's arbitrary and lengthy delay was to undercut the economic feasibility of a five-million-dollar development project); *Smith,* 436 A.2d at 762 ("A right cannot be denied, or an official action arbitrarily and capriciously postponed, for the purpose of passing of prohibitory enactment."). *See also Utah County v. Baxter,* 635 P.2d 61, 65 (Utah 1981) ("to successfully state a defense of equitable estoppel in a zoning case, exceptional circumstances must be present such as the intentional discriminatory application of the ordinance"); *Commercial Properties, Inc. v. Peternel,* 418 Pa. 304, 211 A.2d 514, 519 (1965) (sole purpose of county's actions was to prevent the landowner from proceeding with construction).[10]

---

**10.** Although *Commercial Properties* involved the validity of spot rezoning rather than zoning estoppel, the facts of that case superbly illustrate the sort of egregious conduct which will support a finding of zoning estoppel. As the Pennsylvania Supreme Court explained:

When plaintiffs set out to construct a shopping center on their property, they had every right to do so. But at each step of the way

As the Nebraska Supreme Court explained in *Whitehead II,* 515 N.W.2d at 400, a finding of official malice or ill will is unnecessary. Similarly, a naked intent to delay development is not sufficient unless the government's conduct is also arbitrary and unreasonable. The issue to be considered is whether local officials intentionally discriminated against the landowner's project in a manner that bears no reasonable relationship to legitimate public interests. *See Offen,* 96 Md.App. at 574, 625 A.2d 424 (stating that a zoning estoppel may be found where restrictions are arbitrarily imposed on a discriminatory, "property specific" basis). *Compare Almquist v. Town of Marshan,* 308 Minn. 52, 245 N.W.2d 819, 825 (1976) (concluding that a moratorium on development was adopted as part of a good-faith effort to guide future municipal growth).

■■■ With regard to the causation requirement, the fact finder must conclude that the government conduct at issue was the primary and proximate cause of the landowner's inability to commence construction before the change in zoning. Accordingly, the fact finder must consider whether the landowner had the intention and the ability to proceed with construction. The fact finder must also consider whether there was sufficient time to make a substantial beginning on actual construction before the change in zoning occurred. A zoning estoppel may not be found unless the evidence supports the conclusion that, *but for* the government's misconduct, the landowner would have vested his or her rights in the prior zoning.

We impose this second requirement for obvious reasons. In the absence of the necessary causal relationship, it cannot be

---

they were met with obstructionism and hastily erected barriers. As plaintiffs overcame each objection or complied with each request, township officials were busily erecting new barriers. Plans revised to meet objections were met with additional objections, and requests for approval were summarily cast aside. While plaintiffs were attempting to secure a grading permit as a prerequisite to obtaining a building permit, the township changed its requirements to make the securing of a building permit a prerequisite to obtaining a grading permit. And so the circular pursuit went.
*Commercial Properties,* 211 A.2d at 519.

said that the landowner suffered any prejudice as a consequence of the government's misconduct. In *Richmond Corp. v. Board of County Comm'rs,* 254 Md. 244, 255 A.2d 398 (1969), for example, the Court of Appeals declined to consider whether Prince George's County could be estopped from applying a change in zoning to property owned by Richmond. The Court observed that Richmond was aware of the proposed zoning change, and had "ample time" to begin construction before the zoning ordinance was amended. *Id.* at 256–57, 255 A.2d 398. Consequently, the Court held that the facts in *Richmond* "would not raise an 'estoppel' against the county, even if the doctrine of 'estoppel' were available in a proper case." *Id.* at 257, 255 A.2d 398.

## IV

In the case at hand, both the CBA and the circuit court incorrectly stated the pertinent legal principles. Assuming, *arguendo,* that the CBA had properly applied our zoning estoppel doctrine, we nonetheless conclude that such a decision could not be sustained on the CBA's factual findings. We perceive three distinct shortcomings in the CBA's decision. First, the CBA did not expressly find that the County acted with a deliberate intent to delay Sycamore's proposed development until the new zoning could be enacted.[11] As we noted above, the CBA merely concluded that the County's actions

---

11. As we noted earlier, the County is liable for actual damages if it fails to either acquire or condemn property placed under public reservation. *See* B.C.C. § 26–66(h). Sycamore implicitly suggests that an intent to delay development could be inferred from the fact that county officials discussed how a lawsuit might be avoided at the end of the reservation period. Assuming, *arguendo,* that such an inference could be made, the CBA made no such finding. The CBA merely noted, in reviewing the evidence presented, that the Department of Recreation and Parks consulted with the County Attorney "regarding what the County's damages would be in case the County reserved the property and then didn't acquire it." Moreover, the only evidence on the point appears to be the testimony of Ronald Shaeffer, a superintendent who works with land acquisition. Shaeffer clearly testified that the discussion at issue was unrelated to the downzoning of Hilltop Place. In his words, the discussion about liability "had nothing to do with any kind of zoning."

amounted to "administrative negligence," and "bordered upon arbitrary and capricious." The doctrine of zoning estoppel requires precise factual findings, and the CBA's vague, conclusory statements are not sufficient to justify the CBA's result.

■ Second, the CBA concluded that, if the County had released the reservation in December of 1991, "Sycamore would reasonably have had time to obtain CRG approval and begin construction prior to downzoning." We think the CBA's conclusion in that regard is not supported by substantial evidence. The CBA found that County officials were aware, as of December 31, 1991, that the County lacked sufficient funds to acquire the property. The comprehensive rezoning took effect eleven months later, on December 1, 1992. The only evidence regarding the amount of time needed for Sycamore to begin construction was the testimony of Frederick Chadsey, Sycamore's consulting engineer. The CBA summarized Chadsey's testimony as follows:

> He testified that based on his experience of taking 150 to 200 projects through the CRG process in the County, he estimated that it takes three months or less to take a project from filing through CRG approval, and approximately twelve months *to take it from CRG approval to construction.*

(Emphasis added). When we examine the transcript from the hearing, it appears that the CBA's opinion does not accurately summarize the latter part of Chadsey's testimony. Chadsey testified as follows: "In my opinion, from the *original submittal* of the plan to the time of construction, it would have taken approximately twelve months." (Emphasis added).

Assuming that the property had been released from reservation on December 31, 1991, Chadsey's testimony clearly indicates that Sycamore could not have started construction until at least twelve months later—several weeks after the new zoning took effect. If we accept the CBA's summary of Chadsey's testimony, the process would have taken three months longer. We note, however, that a landowner's rights are not vested on the date that construction begins. As the

Court of Appeals explained in *Sunrise Dev.*, 330 Md. 297, 623 A.2d 1296:

> [I]n order for rights to be vested before a change in the law, *the work done must be recognizable,* on inspection of the property by a reasonable member of the public, as the commencement of construction of a building for a use permitted under the then current zoning.

*Id.* at 314, 623 A.2d 1296 (emphasis added). In reviewing both the CBA's opinion and the record extract, we find no testimony regarding the amount of additional time needed for Sycamore to reach this stage of construction.[12]

We think it unreasonable, however, to conclude that the property could have been released from reservation in December of 1991. None of the officials involved in the proposed acquisition had the authority to release the reservation prior to the September 14, 1992 expiration date; that action could only be taken by a resolution of the County Council.[13] Assuming, *arguendo*, that officials in the Office of Law or the Department of Recreation brought the matter to the Council's attention in December 1991, some time would certainly be required before the question could be brought to a vote at the Council's next scheduled meeting. Accepting, as we must, that County officials recognized the futility of further attempts at acquisition in December 1991, we fail to see how the reservation could have been released before January of 1992 at the earliest. If twelve months were required from the date

---

12. The CBA apparently believed that Sycamore's rights would be vested the moment construction began. The CBA's opinion states, in part:

 If the County had released the reservation in December, 1991 ... Sycamore would reasonably have had to obtain CRG approval and begin construction prior to the downzoning, thus vesting its interest in the property.

13. As appellants point out, § 26–66 of the Baltimore County Code provides no mechanism for the early release of property from public reservation. Nonetheless, a reservation can only be enacted by a resolution of the County Council. B.C.C. § 26–66(b). The Council ordinarily may undo what it has done. In the absence of any provision to the contrary, we conclude that the property could have been released at any time by a subsequent resolution of the Council.

of filing to the time of construction, as Chadsey testified, then Sycamore would not have started construction until January 1993 or later—well after the downzoning took effect. Additional time would have been required before the work was recognizable to a reasonable member of the public. Until that stage of construction had been reached, Sycamore's rights would not have been vested.

 Finally, appellants contend that Sycamore never *asked* the County to release the property from reservation. We have searched the CBA's factual findings in vain for some indication that such a request was made. *See United Steelworkers,* 298 Md. at 679, 472 A.2d 62; *Ocean Hideaway,* 68 Md.App. at 661–62, 515 A.2d 485 (both explaining that an agency's decision must be sustained on the factual findings stated in the agency's opinion or order). The doctrine of zoning estoppel is based on principles of fairness, justice, and equity. Pursuant to § 26–66 of the County Code, Sycamore was exempt from County taxes and assessments throughout the seventeen-month reservation period. We think it unfair for Sycamore to take advantage of the temporary respite from local taxes only to insist, at a later date, that the county's failure to release the property was somehow unjust. The principles of equity also include the doctrine of laches. *See Lipsitz,* 164 Md. at 226, 164 A. 743 (explaining that laches "is an inexcusable delay, without necessary reference to duration, in the assertion of a right"). Assuming, *arguendo,* that Sycamore had a right to release of the property from public reservation in December 1991, the company's failure to request a release was inexcusable. A landowner who sleeps on his or her rights may not claim the benefit of a zoning estoppel. *See Richmond,* 254 Md. at 257, 255 A.2d 398.

For the reasons set forth above, the CBA's conclusion that a zoning estoppel existed was both legally incorrect and unsupported by substantial evidence. Those errors were duplicated in the circuit court. Accordingly, the judgment below is reversed.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER A JUDGMENT REVERSING THE DECISION OF THE BALTIMORE COUNTY BOARD OF APPEALS.

COSTS TO BE PAID BY APPELLEE.